888 F.2d 300
 The UNITED STATES
v.
Hilmer Burdette SANDINI, Ernest G. Rockwell, George White
Kost, Ronald Paul Urban, Carol Ann Hineman Sandini, Sandra
Jean Sandini, Michael Frawley, David Thomson, George
Strickler, Sherman John Glunt, Santos Ruiz, Robert Kotula,
Eugene Anthony Gesuale, Robert Maker, Vincent Ciraolo,
Richard Moody, Edward Mills, Rex Foster, Kenneth Hill, Harry
Jessup, Rose Jessup.
Appeal of David THOMSON.
 No. 89-3057.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1989.
Decided Oct. 30, 1989.
Rehearing and Rehearing In Banc Denied Nov. 30, 1989.
 
 Candace Cain (argued), Reding, Rea & Cooper, P.C., Pittsburgh, Pa., for appellant.
 Charles D. Sheehy, Acting U.S. Atty., Paul J. Brysh, Constance M. Bowden (argued), Asst. U.S. Attys., Pittsburgh, Pa., for appellee.
 Before SLOVITER, GREENBERG and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 BACKGROUND
 
 1
 David Thomson appeals to this court from the judgment of conviction and sentence entered on December 28, 1988, in the district court following his conviction for two narcotics offenses. This proceeding was originated when a multi-count indictment was returned on June 28, 1985, against Thomson, George Kost and 19 other defendants in the Western District of Pennsylvania. Thomson was charged in two counts of the indictment. In count one he, along with 14 of the other defendants, including Kost, was charged with participation in a conspiracy to possess with intent to distribute and to distribute cocaine from August 1981 until May 1984 in violation of 21 U.S.C. Sec. 846. In count eleven he was charged with aiding and abetting the possession of cocaine with intent to distribute on May 3, 1982, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. Kost was also charged in five other counts of the multi-count indictment and, in addition, was charged in a separate indictment, with conducting a continuing criminal enterprise from the summer of 1981 until May 1985, contrary to 21 U.S.C. Sec. 848(a).[1]
 
 
 2
 Thomson and Kost were not immediately apprehended following the indictment. However, certain of the other defendants were tried and convicted in 1985 and others entered pleas of guilty. Thomson was arrested in Manheim Township, Pennsylvania, on an unrelated state burglary charge on April 25, 1987, and was held in state custody until early April 1988. On April 7, 1988, the district court issued a writ of habeas corpus and prosequendum to the warden of the Lancaster County jail where Thomson was being held and Thomson then passed to federal custody. Kost also became available for trial at about the same time. Thomson and Kost pleaded not guilty to all charges.
 
 
 3
 Thomson served and filed numerous pretrial motions, including a motion for severance which, after oral argument, was denied on May 18, 1988. Subsequently, Thomson and Kost were jointly tried before a jury and, on July 6, 1988, Thomson was found guilty on both counts against him. Kost was convicted on the separate indictment of conducting a continuing criminal enterprise and of four of the six counts in which he was charged in the multi-count indictment, the conspiracy count and three counts of possession of cocaine with intent to distribute, including count eleven in which Thomson was also charged.
 
 
 4
 On December 28, 1988, Thomson was sentenced to a term of 15 years on the conspiracy count, and to a consecutive term of five years on count eleven for aiding and abetting the possession of cocaine with intent to distribute. In addition, a term of 15 years' special parole was imposed on him. Thomson appeals, contending that he did not get a fair trial because the court denied his pretrial motion to sever his trial from Kost's and Kost's attorney in his closing argument admitted that Kost was guilty of conspiracy and implicated Thomson in the conspiracy. In addition, Thomson contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt on count eleven. Finally, Thomson urges that he was denied effective assistance of counsel because his trial counsel refused, notwithstanding Thomson's request that he do so, to file a motion to dismiss the indictment against him on the ground that he was denied a speedy trial.
 
 THE FACTS
 
 5
 The facts of this case were established at the trial by numerous witnesses, all called by the government, some of whom had themselves been charged in the indictment. The evidence clearly established that there was a large scale conspiracy, including Thomson and Kost, to possess and distribute cocaine commencing around October 1981 and lasting until May 1984, a few months after a disgruntled participant, James McAuliffe, began acting as an informant for the Federal Bureau of Investigation. Thomson's involvement in the conspiracy centered on his role as Kost's bodyguard and may be traced to the late 1970's, when he was an occasional cocaine customer of Ernest Rockwell, a wholesale cocaine dealer in the Pittsburgh area, who was also a defendant in the multi-count indictment and who testified for the government. At that time, Rockwell was purchasing cocaine in kilo lots from Richard Dunlap, who maintained drug connections with dealers in Florida. Kost was one of Rockwell's regular customers, purchasing cocaine in increasingly larger amounts.
 
 
 6
 In 1980 Rockwell grew dissatisfied with Dunlap and moved to Florida to establish new sources for cocaine. There he formed an association with Lauren Lee, from whom he purchased individual kilos of cocaine for distribution in the Pittsburgh area. In the course of his dealings with Lee, Rockwell became acquainted with Hilmer Sandini, who later became a conspirator in the drug ring and was named in the multi-count indictment.
 
 
 7
 Rockwell's relationship with Lee terminated in the summer of 1981. Around that time, Rockwell and Sandini formed the partnership which became the hub of the conspiracy. Rockwell testified that he and Sandini agreed that Sandini would obtain large quantities of cocaine in Florida for transportation by courier to Rockwell in Pittsburgh. Rockwell then would sell the cocaine to dealers in the Pittsburgh area with profits to be split equally between Rockwell and Sandini. After setting up this operation with Sandini, the volume of cocaine Rockwell distributed in Pittsburgh increased dramatically. Kost became Rockwell's largest purchaser, as described by Rockwell, his "number one man," and as such was entitled to a volume discount.
 
 
 8
 In 1981 or 1982, Thomson questioned Rockwell about Kost because Thomson was working for persons who claimed that Kost owed them approximately $30,000. Thomson intended to collect this debt by kidnapping Kost or his daughter. Rockwell, however, was anxious to have a confrontation avoided so he introduced Thomson to Kost, who convinced Thomson that these alleged creditors were merely competitors in the cocaine business endeavoring to usurp his clientele. At the conclusion of this meeting, Thomson agreed to work for Kost as a personal bodyguard. Thereafter, Thomson obtained cocaine from both Rockwell and Kost in quantities ranging from 4 to 10 ounces per month.
 
 
 9
 Thomson's former girlfriend, Sharon Spuganich, testified that Thomson normally carried guns when he worked for Kost and that she observed a sawed-off shotgun and two handguns in Thomson's apartment. She and other witnesses testified that Thomson collected money from cocaine transactions for Kost. For example, Ronald Urban, one of Kost's distributors and a defendant in the multi-count indictment, testified that Thomson handcuffed James McAuliffe to the steering wheel of a car after he sold a quantity of Kost's cocaine without Kost's knowledge, an unusual but effective collection procedure which caused McAuliffe to pay what he owed to Kost. Overall, the evidence of Thomson's participation in the conspiracy was overwhelming and, indeed, he does not challenge the sufficiency of the evidence on that count.
 
 
 10
 The testimony surrounding the charge in count eleven, that Thomson aided and abetted the possession of cocaine with intent to distribute on or about May 3, 1982, in the Western District of Pennsylvania, was somewhat inconsistent. The evidence established that around May 3, 1982, Kost, Thomson, and Gary Vowinkle flew to Florida on a commercial airline, where they were met by Hilmer Sandini and Danny Mitrione, an undercover FBI agent who became criminally involved in the conspiracy and was sentenced to prison on other charges. Mitrione testified that the purpose of the trip was for Vowinkle and Kost to purchase one kilo of cocaine for transportation by private plane to Cedar Rapids, Iowa, for sale to one of Vowinkle's customers. If the Iowa customers were satisfied, then Kost, Thomson and Vowinkle hoped to return to Florida with sufficient funds to purchase more cocaine. Thomson was present as Kost's bodyguard.
 
 
 11
 Mitrione testified that immediately after Kost, Vowinkle and Thomson arrived from Pittsburgh, he and Sandini drove with them to a restaurant, where they discussed the details of the drug transaction. During that meeting, Mitrione and Kost met privately in the restaurant parking lot, where Kost gave Mitrione $52,000 in cash for one kilo. Mitrione testified that Rockwell arrived in Florida the following day, May 4, 1982, and that he and Sandini picked him up at the airport. They then purchased a kilo of cocaine from one of Sandini's sources in South Miami, a woman named Gloria. Sandini then provided Kost, Vowinkle and Thomson with his private plane to fly the kilo to Iowa. Edward Merchant, Sandini's personal pilot, testified that he flew Kost, Thomson and Vowinkle to Cedar Rapids, Iowa, where they were delayed for several days. He then flew them directly to Pittsburgh and returned, alone, to Florida.
 
 
 12
 Rockwell testified that the purpose of the trip on May 3, 1982, was to purchase 6-7 kilos of cocaine which, following the Iowa sale, would be used to finance the purchase of more cocaine in Florida for transportation to Pittsburgh for distribution to Rockwell's and Kost's respective customers. Rockwell testified that he was present with Danny Mitrione and Hilmer Sandini when Kost, Vowinkle and Thomson arrived in Florida and that, following negotiations concerning the price, Sandini purchased approximately 4-6 kilos of cocaine from a dealer named Alex. He said that Thomson was present during the negotiations but did not contribute to them. Rockwell further testified that Kost, Vowinkle and Thomson ultimately returned to Florida, picked up an unspecified amount of cocaine that Sandini and Rockwell were holding for them, and returned with it to Pittsburgh. It thus appeared that there was some confusion regarding when Rockwell arrived in Florida and where Kost, Vowinkle and Thomson went after their trip to Iowa.
 
 
 13
 Rockwell's testimony was, however, partially corroborated by that of Ronald Urban and Sharon Spuganich. Urban testified that he picked up Kost, Vowinkle and Thomson at the airport in Pittsburgh in the spring of 1982. Urban believed that they were coming directly from Florida. Kost informed Urban that he had a few kilos of cocaine in his duffel bag but Urban admitted that he did not personally see any cocaine. Urban dropped the three off at a motel and then returned a day or so later and purchased some cocaine from them. Spuganich testified that she met Kost and Thomson at Kost's house in the Pittsburgh area after their return from Iowa, and that Thomson had a large quantity of cocaine with him.
 
 
 14
 In the spring of 1984, Rockwell's partnership with Sandini unravelled because Sandini was drying up as a cocaine source. Sandini was arrested in April 1984 and Rockwell was arrested on a gun charge in the late summer. Around that same time, after Rockwell's sentencing on the gun charge, Rockwell and Kost discovered that McAuliffe was an informant for the FBI.
 
 
 15
 In January 1985, Kost and Thomson traveled to Iowa to meet with Mark Meyers, who apparently was under investigation in connection with the conspiracy, and Kost offered to pay his legal fees. Kost also paid for legal representation for other persons regarding a grand jury investigation of cocaine transactions.
 
 DISCUSSION
 PRETRIAL SEVERANCE
 
 16
 We deal first with Thomson's contention that the district court erred in denying his pretrial motion for severance of his trial from that of Kost. In his pretrial motion, Thomson set forth that both he and Kost had been indicted but that his involvement "is significantly less than that" of Kost. He further recited that because "of the vast difference in the evidence that will be presented against each of [them] [they] should be tried separately." In his supporting brief Thomson asserted that it was "the belief of [his] counsel" that Thomson would offer a defense "truly antagonistic" to that of Kost and that the defenses would be "mutually exclusive." He did not, however, explain why the defenses would be antagonistic or mutually exclusive. He further set forth in the brief that "in the event that any [sic ] of the above co-defendant fails to testify at the trial of the above case that counsel for Defendant must comment upon such failure to testify during presentation of closing argument."
 
 
 17
 On appeal Thomson shifts his ground and seems to urge this court to formulate a general rule prohibiting a joint trial where one defendant is charged with conspiracy as well as the more serious offense of conducting a continuing criminal enterprise and his co-defendant is charged only with conspiracy. Thomson reasons that, in such cases, it is foreseeable that the defendant facing the continuing criminal enterprise charge might defend by admitting involvement in the conspiracy but arguing that his level of culpability was no greater than that of his co-conspirators. In that event, the defendant charged only with conspiracy would, in effect, be prosecuted by both the government and by counsel for his co-defendant, because his co-defendant would have admitted an essential element of the conspiracy charge, i.e., the existence of an unlawful agreement. Thomson also asserts that he was unfairly prejudiced by the spillover effect of evidence relating to the continuing criminal enterprise charge against Kost.
 
 
 18
 Inasmuch as a ruling by the district court on a motion for severance is discretionary, we review the order only to determine if the district court abused its discretion in denying severance. United States v. Sebetich, 776 F.2d 412, 427 (3d Cir.1985), cert. denied, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988); United States v. Boscia, 573 F.2d 827, 832 (3d Cir.), cert. denied, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). The district court, in exercising its discretion, balances the potential prejudice to the defendant against the advantages of joinder in terms of judicial economy. Sebetich, 776 F.2d at 427. Of course, it is well established that judicial economy favors a joint trial where defendants are jointly indicted, United States v. Simmons, 679 F.2d 1042, 1051 (3d Cir.1982), cert. denied, 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983), and where defendants are charged with a single conspiracy. United States v. Dickens, 695 F.2d 765, 778-79 (3d Cir.1983), cert. denied, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983). Consequently, the burden is on the defendant to establish a reason for a severance.
 
 
 19
 It is important to recognize that there are two separate determinations to be made when a defendant on appeal urges that he is entitled to a reversal because the district court denied a pretrial severance motion. Since the district court acted on the basis of the record before it at the time of the motion, we must first determine from that record whether the court abused its discretion in denying the severance. Then, if there was an abuse of discretion, we must consider whether the defendant was prejudiced by the order denying severance.[2]
 
 
 20
 Thus, we cannot decide whether the court erred in its ruling denying severance simply because it later appeared that the defendant was prejudiced by participating in a joint trial, for the events at trial might not have been foreseeable prior to trial.[3] Of course, if the developments at the trial were reasonably foreseeable at the time of the district court's pretrial ruling, then they are germane on the question of whether the district court initially abused its discretion. We recognize, however, that while an appeal predicated on the district court's denial of a motion for severance implicates two separate issues, abuse of discretion and prejudice, we have not always clearly distinguished between the two issues. See, e.g., Sebetich, 776 F.2d at 427 ("We hold that the district court did not err in denying the motions to sever because the appellants failed to carry their burden of showing prejudice to their cases."); United States v. Reicherter, 647 F.2d 397, 400 (3d Cir.1981) ("The trial judge acted well within his discretion in denying defendant's motion for severance. Defendant pinpoints no specific instance of prejudice.")
 
 
 21
 Here we cannot possibly conclude that the district court abused its discretion in denying the pretrial motion to sever. As we have indicated, in cases of defendants jointly indicted ordinarily there should be a single trial. Thomson in his motion to sever asserted in a totally conclusory fashion that his defense would be "truly antagonistic" to that of Kost and that the defenses of the two defendants were "mutually exclusive." While there is no doubt that Thomson used the correct terms in asking for a severance on this basis, see United States v. Provenzano, 688 F.2d 194, 198 (3d Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982), what he did not do was to give the district court any explanation of why the defenses were mutually exclusive or truly antagonistic. Thus, the district court could not ascertain whether Thomson's claim was accurate and had no foundation on which to rest an order granting severance.
 
 
 22
 Thomson's other pretrial basis for severance was more specific, as he asserted that one defendant might want to comment on the fact that the other did not testify. The district court, however, did not abuse its discretion in rejecting this contention because the court would have had to speculate to assume that that situation might arise. Furthermore, the predicate for the possibility that one defendant might want to comment on the other defendant's failure to testify, is that the commenting defendant testify himself. Obviously, if a defendant does not testify and yet comments on his co-defendant's failure to testify, he is in reality commenting on his own failure to testify as well. In fact, since neither defendant testified, Thomson did not have reason to comment on Kost's failure to testify. Thus, this particular problem which Thomson anticipated from a joint trial did not materialize and to this extent Thomson could not have possibly suffered prejudice by being tried jointly with Kost. Indeed, in his brief Thomson does not even urge that the district court abused its discretion because of its rejection of this theory for his motion.[4] Therefore, in view of the developments at trial, even if the district court abused its discretion in rejecting this basis for pretrial severance, which it did not, its error was harmless.
 
 THE CLAIM OF TRIAL PREJUDICE
 
 23
 In view of our analysis, we would be justified in not even addressing Thomson's contentions that he was prejudiced at trial by the circumstance that Kost was charged with both conspiracy and conducting a continuing criminal enterprise and Thomson was charged with only conspiracy and was further prejudiced by the spillover effect of evidence relating to the continuing criminal enterprise charge. Inasmuch as these specific possibilities were not raised in the pretrial motions, we cannot understand how the district court could be held to have abused its discretion on the basis of them in denying the pretrial motion to sever. But we will nevertheless consider these contentions on the remote basis that perhaps the alleged trial prejudice, even in the absence of a motion to sever at trial, rose to the level of plain error. In the discussion of these claims of prejudice, we do not consider Thomson's contention that his conviction should be reversed because of Kost's attorney's closing argument, as we will deal with that matter separately.
 
 
 24
 The principles governing this inquiry into trial prejudice are clear. In order for Thomson to obtain a reversal because of prejudice at trial, following the trial court's failure to order a severance, he must demonstrate "clear and substantial prejudice resulting in a manifestly unfair trial." United States v. Reicherter, 647 F.2d 397, 400 (3d Cir.1981) (emphasis added); see United States v. Gorecki, 813 F.2d 40, 43 (3d Cir.1987). It is not sufficient for him merely to allege that severance would have improved his chances for an acquittal. Reicherter, 647 F.2d at 400.
 
 
 25
 The prejudice Thomson alleges from joinder with Kost does not satisfy the "clear and substantial" standard identified by this court in Reicherter, for the cases do not support his proposition that a defendant charged solely with conspiracy should never be jointly tried with a defendant charged with conspiracy and with conducting a continuing criminal enterprise. Indeed, the cases are to the contrary. See, e.g., United States v. Webster, 734 F.2d 1048, 1052-54 (5th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (rejecting claim of antagonistic defenses where one co-defendant, indicted for conducting a continuing criminal enterprise and conspiracy, admitted involvement in the cocaine conspiracy); United States v. Lurz, 666 F.2d 69, 80 (4th Cir.1981), cert. denied, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982); United States v. Bolts, 558 F.2d 316, 322 (5th Cir.), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). See also Sebetich, 776 F.2d at 427 (upholding denial of severance where co-defendants admitted guilt to some robberies charged in indictment).
 
 
 26
 We see no reason why in a joint trial of defendants charged with conspiracy, the fact that one is additionally charged with conducting a continuing criminal enterprise would somehow interfere with the jury's ability to consider the evidence against each defendant separately. Undoubtedly, there are many criminal cases in which defendants are tried together on different counts, so that all the evidence is not germane to all the counts against each defendant. Thus, we conclude that there is no inherent prejudice or anything unique in a joint trial when one defendant is charged with conducting a continuing criminal enterprise and conspiracy, and the other simply with conspiracy.
 
 
 27
 Thomson's assertion that he was prejudiced in this particular case by the spillover of evidence relating to Kost's continuing criminal enterprise charge also is without merit. In considering a contention that a disparity in evidence against co-defendants mandates severance, we determine "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." United States v. De Larosa, 450 F.2d 1057, 1065 (3d Cir.1971), cert. denied, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). Thomson was charged with the conspiracy and with the substantive aiding and abetting offense on May 3, 1982. Kost was charged with possession of cocaine with intent to distribute on January 2, 1982, March 15, 1982, March 30, 1982, April 19, 1982, and May 3, 1982, in addition to the conspiracy and continuing criminal enterprise charges. Kost was acquitted of the offenses alleged to have occurred on March 15 and March 30, a fact indicating that the jury carefully weighed the evidence relating to each defendant and each charge.
 
 
 28
 Moreover, it is difficult to conclude that there is a prejudicial spillover where, as here, there is substantial independent evidence of a defendant's guilt. See United States v. Tarantino, 846 F.2d 1384, 1398-99 (D.C.Cir.),cert. denied, --- U.S. ----, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988); United States v. De Peri, 778 F.2d 963, 984-85 (3d Cir.1985), cert. denied, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); United States v. Dansker, 537 F.2d 40, 62 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Here the evidence directly against Thomson was so very strong that it is difficult to see how he could have been acquitted, particularly on the conspiracy count, as he was literally immersed in the drug transactions. Indeed, at one point during a legal argument regarding certain evidence, the district court indicated, correctly, that based on the evidence the likelihood of Thomson being acquitted was "nil" and "zero," even though the government had not yet rested.
 
 
 29
 Furthermore, this trial involved only two defendants. Frequently, many more defendants are jointly tried and yet the jury is able to return separate verdicts against each. We also think it significant that Thomson's argument regarding the spillover of evidence is quite general in that he does not advise us what evidence relevant only to Kost the jury would have been unable to have set aside when considering the case against Thomson. Overall, we are satisfied that Thomson was not prejudiced because of the spillover effect of the evidence against Kost.
 
 THE CLAIM OF PREJUDICE FROM THE SUMMATION
 
 30
 Thomson's contention pertaining to Kost's attorney's closing argument arises from the circumstance that in his closing argument the attorney, to stave off Kost's being convicted for conducting a continuing criminal enterprise, argued that Kost's level of responsibility in the conspiracy was no greater than that of his co-conspirators. In so doing, Kost's trial counsel conceded both his client's involvement in the conspiracy and the fact that he exercised substantial control over Thomson's activities. He stated:
 
 
 31
 Mr. Kost is not going to contest the conspiracy. Beyond any reasonable doubt, Mr. Kost sold narcotics in the Western District of Pennsylvania, he purchased some in Florida and sold them in the Western District of Pennsylvania through from about 1981 through whatever it was in 1984. No question ...
 
 
 32
 I do suggest to you, however, that with the continuing criminal enterprise, there is a substantial problem in terms of Mr. Kost ... One of the requirements in a CCE is that you find beyond a reasonable doubt in this case that Mr. Kost occupied a position as organizer, supervisor or manager over five people.
 
 
 33
 One of the reasons for the massive quantity of evidence and the intricate weaving of the interrelationships of the players to you and why they used 36 witnesses instead of about four witnesses that would have or would have not proved the charges, was to try and induce you to believe that the association with this vast number of people who were involved in the narcotics business meant that Mr. Kost managed, supervised, or in some manner employed or organized certain other people....
 
 
 34
 Now, the government would have you believe that over a period of time just because people had an involved relationship and purchased narcotics or sold narcotics to a particular person, that that person organized, managed, or oversaw them in some sense of the word. I'm suggesting to you that he did not.
 
 
 35
 Let me give you an example of where perhaps Mr. Kost did organize or control or manage another individual. You have heard testimony about Mr. Thomson being employed as a bodyguard. That's the type of relationship that you're talking about in terms of organizing, managing or controlling another individual. I don't think there's any doubt that based on what you have been told here today, that you could clearly find that Mr. Thomson was organized or managed by Mr. Kost. I don't see any problem in doing that.
 
 
 36
 I don't see any problem in a couple others. I don't see any problem in you finding that Mr. Kotulo, who was a relative of Mr. Kost, was organized or managed by Mr. Kost. I don't think you'd have too much problem finding Jim McAuliffe to have worked for Mr. Kost, but I think at that point that's where it stops....
 
 
 37
 Thomson did not object to this argument at trial, renew his motion for severance, or request curative instructions. Accordingly, he urges this court to apply the plain error rule and hold that the district court erred in failing to grant him a mistrial sua sponte and severing the case. See Fed.R.Crim.P. 52(b). He contends that he was prejudiced by this statement, as Kost's attorney's argument was inconsistent with Thomson's contention that he was not a member of the conspiracy but was simply associating with Kost.[5] Furthermore, he contends that the attorney's remarks were tantamount to an inculpatory confession by a co-defendant who does not testify and thus Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), should be applied here.
 
 
 38
 In United States v. Young, the Supreme Court explained that
 
 
 39
 [Rule 52(b) ] authorizes the Courts of Appeals to correct only 'particularly egregious errors,' those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' In other words, the plain error exception to the contemporaneous objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'
 
 
 40
 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted). The Supreme Court cautioned appellate courts to consider the totality of evidence against the accused when evaluating the seriousness of the claimed error. Id. at 16, 105 S.Ct. at 1047.
 
 
 41
 In United States v. Thame, 846 F.2d 200, 205 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988), we described the plain error rule as follows:
 
 
 42
 This court has not interpreted Young as establishing a rigid test for plain error. Instead, we have continued to look on a case-by-case basis to such factors as the obviousness of the error, the significance of the interest protected by the rule that was violated, the seriousness of the error in the particular case, and the reputation of the judicial proceedings if the error stands uncorrected--all with an eye toward avoiding manifest injustice.
 
 
 43
 In considering this issue, we acknowledge that an appropriate denial of a pretrial motion for severance does not preclude a later ruling that there should be a severance because of prejudice which develops at trial. See Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). However, we also point out that it is risky business for a judge on his own motion to declare a mistrial, as the defendant may thereafter contend that he was entitled to a completion of the first trial so that a retrial is barred by double jeopardy principles. See Arizona v. Washington, 434 U.S. 497, 503-04, 98 S.Ct. 824, 829-30, 54 L.Ed.2d 717 (1978). Thus, the defendant who, without asking for a mistrial gets one, will surely argue, and not unreasonably, that if he did not, as here, regard the alleged error as serious enough even to prompt his reaction, a court is effectively granting a mistrial over his objection without "manifest necessity" so that his retrial is barred. Id. at 505, 98 S.Ct. at 830. Furthermore, we point out that declaring a mistrial because of the conduct at trial of a co-defendant, as opposed to that of the government, may well encourage collusive conduct by defendants at a joint trial so as to set the stage for mistrials and possible reversals. The considerations we have set forth lead us to approach Thomson's argument with considerable caution.
 
 
 44
 As we have indicated, Thomson's first asserted basis for relief, predicated on Kost's attorney's statement, is that the statement was inconsistent with Thomson's defense. Our test for severance in this situation is not lightly met, as severance need be granted only if the defense theories are antagonistic " 'to the point of being irreconcilable and mutually exclusive.' " United States v. Provenzano, 688 F.2d at 198. See also United States v. Barber, 442 F.2d 517, 530 (3d Cir.), cert. denied, 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971) (stating that "the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another" does not require severance). The Court of Appeals for the Fifth Circuit suggests that "[t]he defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses." United States v. Webster, 734 F.2d at 1053. The logic of granting a severance when there are irreconcilable and mutually exclusive defenses seems manifest. Defendants should not be placed in a position where the mere fact that they are being tried together will effectively require the jury to convict at least one of them, whereas in separate trials each could be acquitted.
 
 
 45
 Here the offenses highlighted by Kost's attorney's argument were the conspiracy charges against both Kost and Thomson and the charge of conducting a continuing criminal enterprise against Kost. But the jury was not placed in a position that to acquit Kost it had to accept his suggestion that Thomson was a member of the conspiracy. To the contrary, the jury could have simply concluded that, regardless of the relationship between Thomson and Kost, the government had not established the elements of the offense of conducting a continuing criminal enterprise. Thus, Kost's attorney's argument did not make this case into an "either or" situation as between the two defendants. Accordingly, the defenses, though arguably hostile, were not beyond reconciliation.
 
 
 46
 We also point out that the defenses were not so hostile as Thomson suggests. There is, of course, no doubt that Thomson was involved with the conspirators. As he explains in his brief: "Mr. Thomson's defense to conspiracy was that he was not a participant but that he was merely present. He argued that the evidence showed his involvement was minor and that the government did not prove an agreement was entered into by Mr. Thomson." The difference between the theories of Kost and Thomson was a matter of an understanding of the evidence. Whereas Kost's interpretation as expressed in his attorney's closing argument can be taken to mean that Thomson was part of the conspiracy. Thomson's interpretation was benign. But the defendants were simply drawing different conclusions from the same testimony, all from witnesses called by the government.
 
 
 47
 This case is entirely dissimilar to a case in which each defendant contends he could not have committed an act because the other did it. Furthermore, Thomson suggested in his closing that he may have been duped by Kost into providing the appearance of physical protection. This contention, if accepted by the jury, would have been reconcilable with Kost's attorney's argument that Kost employed Thomson, but would have been inconsistent with a finding that Thomson had "knowingly" and "intentionally" entered into the conspiracy as charged in the indictment. See United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir.1988).
 
 
 48
 There is no merit to Thomson's contention that Kost's attorney's remarks in closing argument were tantamount to a confession by Kost, inculpatory as to Thomson, within Bruton v. United States, 391 U.S. at 123, 88 S.Ct. at 1620. In Bruton, the Supreme Court held that a criminal defendant's Sixth Amendment confrontation right is violated where a hearsay confession by his co-defendant inculpating the defendant is admitted into evidence and the co-defendant does not testify. Id. at 126, 88 S.Ct. at 1622. In such situations, limiting instructions by the trial court are not an adequate remedy and if the statement is to be admitted without being appropriately redacted, severance is required. Id. at 137, 88 S.Ct. at 1628. We have, however, never held that Bruton applies when the attorney for a co-defendant implicates a defendant during a closing argument and we perceive of no reason to do so because the arguments of counsel are simply not evidence. See United States v. Vadino, 680 F.2d 1329, 1336 (11th Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). Bruton is directed toward preserving a defendant's right to cross-examination, and thus has nothing to do with arguments of counsel based on their interpretation of the evidence. Indeed, in this case, as is usual, the court and the assistant United States attorney both informed the jury that the arguments of counsel do not constitute evidence.
 
 
 49
 We recognize that it might have been prudent for the district court on its own initiative to have interrupted Kost's attorney's summation to emphasize that the attorney's argument was not evidence. But we certainly cannot find plain error, if there was error at all, in its failure to do so. The argument of Kost's attorney, insofar as it mentioned Thomson, was directed to the conspiracy count on which the evidence was overwhelming and we cannot believe that the outcome of the case against Thomson was in any way influenced by the argument.[6]
 
 THE SUFFICIENCY OF THE EVIDENCE
 
 50
 Thomson also challenges his conviction under count eleven for aiding and abetting the possession of cocaine with intent to distribute, asserting that the evidence was insufficient to prove beyond a reasonable doubt that he committed that offense. We have reviewed the record to determine whether there is substantial evidence to support the jury's determination of guilt and we have concluded that there clearly is. Thus, we reject Thomson's contention on this point. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Aguilar, 843 F.2d 155, 157 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988).
 
 
 51
 As we previously set forth, Rockwell gave direct evidence on this count as he indicated that Kost, Vowinkle and Thomson, following the Iowa trip, returned to Florida and obtained additional cocaine and took it to Pittsburgh. Furthermore, as we have already set forth, Rockwell's testimony was partially corroborated by that of Urban and Spuganich. We also point out that there is no question but that Thomson was assisting Kost as a bodyguard in his cocaine transactions so the jury most certainly did not have to believe that Thomson was simply along for the ride on Kost's trips. Rather, the record fully supports the conclusion that Thomson "associated himself with the criminal venture as something he wished to bring about and that he sought by his actions to make it succeed." United States v. American Investors of Pittsburgh, Inc., 879 F.2d 1087, 1103 (3d Cir.1989).
 
 
 52
 We realize that other inferences are possible from the evidence, but that circumstance does not justify us in rejecting the jury's verdict. As we stated in United States v. Cooper, " '[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt.' " 567 F.2d 252, 254 (3d Cir.1977). See also Leon, 739 F.2d at 891.
 
 THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM
 
 53
 We will not reach the merits of Thomson's final contention that he was denied effective assistance of counsel because his trial attorney did not file a motion to dismiss the indictment on the alleged basis that Thomson was denied a speedy trial.[7] We have repeatedly expressed our strong preference for reviewing allegations of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. Sec. 2255 rather than on direct appeal. See Government of Virgin Islands v. Forte, 806 F.2d 73, 77-78 (3d Cir.1986); United States v. Gambino, 788 F.2d 938, 950 (3d Cir.), cert. denied, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986). Our rationale for reserving such claims for collateral review is that "oft-times such claims involve allegations and evidence that are either absent from or not readily apparent on the record." Gambino, 788 F.2d at 950.
 
 
 54
 In Government of Virgin Islands v. Zepp, 748 F.2d 125 (3d Cir.1984), we did recognize a narrow exception to this general rule for cases where the Sixth Amendment claim of ineffective assistance of counsel is predicated upon an actual conflict of interest between the accused and his attorney apparent from the face of the record, as in that case prejudice is presumed and no further factfinding is needed to resolve the claim. Id. at 133-34. See Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In contrast, claims predicated upon attorney's errors do require a showing of prejudice and therefore may involve facts not adequately developed in the record. Zepp, 748 F.2d at 133. See also Gambino, 788 F.2d at 950-51.
 
 
 55
 Here, Thomson alleges that the government knew he was taken into state custody in Lancaster County on April 25, 1987, but intentionally delayed bringing him to Pittsburgh for his initial appearance because Kost had not yet been apprehended and the government hoped to gain tactical advantages by trying them jointly. Thomson argues that his counsel should not have concluded on his own that the time Thomson spent in state custody was excludable under the Speedy Trial Act, 18 U.S.C. Sec. 3161(h)(1)(D). Thomson also argues that he suffered actual prejudice from the joint trial with Kost.
 
 
 56
 Thomson, however, has not alleged on this appeal that he and his attorney had any actual conflict of interest. Therefore, this case does not fall within the Zepp exception to this court's preference for collateral review. Furthermore, the record is insufficient for us to determine whether a reasonable attorney would have filed a motion to dismiss on speedy trial grounds. For instance, though Thomson suggested at trial that the Government was promptly aware of his state arrest, the record does not clearly indicate when federal authorities learned of Thomson's detention in Lancaster County or the stage of the state proceedings at the time the federal writ of habeas corpus was issued.[8] We also point out that we do not have the attorney's explanation as to why the motion to dismiss on the constitutional basis was not filed, though it does appear that the attorney concluded there was no violation of the Speedy Trial Act.[9] We further note that we cannot possibly say that if the motion had been made it would have been granted and thus we cannot say that Thomson was prejudiced by its not being made. In the circumstances, though we are affirming Thomson's conviction, we do so without prejudice to his filing a collateral proceeding under 28 U.S.C. Sec. 2255.
 
 
 57
 For the foregoing reasons the judgment of conviction and sentence of December 28, 1988, will be affirmed.
 
 
 
 [1]
 It is not clear to us why the period of the continuing criminal enterprise extended for one year beyond the period of the conspiracy
 
 
 [2]
 The mere fact that the court errs in not granting severance does not mean that a defendant is prejudiced by the ruling. For example, the court might err in refusing to grant a severance required by Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), but if the government then does not offer the co-defendant's confession, there would be no prejudice
 
 
 [3]
 It is possible that even if the district court did not abuse its discretion in denying severance, events at trial may nevertheless require curative steps
 
 
 [4]
 He does set out in his brief on appeal that "[o]ne specific ground raised was that should [Kost] fail to testify, Mr. Thomson would be forced to comment on such failure" but that "[n]either defendant testified in the present case." No further reference is made in the brief to the point
 
 
 [5]
 He also asserts that he was prejudiced because Kost's attorney relieved the government of the burden of establishing that Thomson was part of the conspiracy, but this contention is devoid of merit and requires no substantial discussion, as the government showed Thomson's participation in the conspiracy by overwhelming evidence and Kost's attorney was simply commenting on what had already been proven
 
 
 [6]
 In fact, in view of Kost's conviction for conducting a continuing criminal enterprise, it is evident that the argument was not effective at all
 
 
 [7]
 We find it ironical that Thomson raises this point, as by far the most substantial part of the delay between indictment and trial was attributable to the fact that Thomson was a fugitive until he was arrested on the state charges. His asserted interest in a speedy trial did not manifest itself until after he was apprehended
 
 
 [8]
 In response to a motion which Thomson filed pro se after the trial, seeking appointment of a new attorney, the government asserted that after Thomson was apprehended in April 1987 on the state charges, he "proceeded to trial" on those charges and those "proceedings were still ongoing as of the time [Thomson] was removed to this district for trial...."
 
 
 [9]
 Thomson's trial attorney did not file any response to Thomson's post-trial motion for appointment of a new attorney. Thomson is represented on this appeal by a new attorney