UNITED STATES of America, Appellee at Nos. 89–5372/5383, Appellant at No. 89–5510

v.

Gaetano VASTOLA, Appellant at No. 89–5372, Appellee at No. 89–5510

v.

Elias SAKA, Appellant at No. 89–5383.

Nos. 89–5372, 89–5383 and 89–5510.

United States Court of Appeals, Third Circuit.

Argued Feb. 6, 1990.

Decided March 20, 1990.

Herald Price Fahringer (argued), Diarmuid White, Michael Rosen, Joy Vastola, Lipsitz, Green, Fahringer, Roll, Schuller & James, New York City, for Gaetano Vastola.

Barry M. Fallick (argued), Rochman, Platzer, Fallick & Rosmarin, New York City, for Elias Saka.

Samuel A. Alito, Jr., U.S. Atty., Edna Ball Axelrod, Chief, Appeals Div., Marion Percell (argued), Asst. U.S. Atty., Newark, N.J., for U.S.

Before GREENBERG, SCIRICA, and SEITZ, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

Table of Contents

I. Introduction 214
II. The Facts 215
 1. The Dwek Loan 216
 2. The MCA Deal 217
III. Discussion
 A. Government's Appeal
 1. Jurisdiction 219
 2. Inconsistency of the Verdict on Count 1 222
 B. Sufficiency of the Evidence on Count 2 226
 C. The RICO Conspiracy 228
 D. Sufficiency of the Evidence of MCA Extortion 229
 E. Naming of the RICO Enterprise 230
 F. Admissibility of Testimony Regarding Loansharking Terms 232
 G. Reference to Federal Witness Protection Program 234
 H. Appointment of New Counsel 236
 I. The Electronic Surveillance
 1. Background 237
 2. Admissibility of Evidence from Electronic Surveillance 239
IV. Conclusion 242

I. INTRODUCTION

Gaetano Vastola and Elias Saka appeal to this court from final judgments of conviction and sentence entered by the United States District Court for the District of New Jersey on May 3, 1989, following a

jury trial in which they were found guilty of two substantive RICO offenses under 18 U.S.C. § 1962(c), a RICO conspiracy offense under 18 U.S.C. § 1962(d), and a conspiracy to use extortionate means to collect an extension of credit, in violation of 18 U.S.C. § 894. In addition, Saka was found guilty of various other extortion offenses and of mail and wire bankruptcy and insurance fraud. The United States, pursuant to 18 U.S.C. § 3731, appeals from an order of the district court, entered on April 28, 1989, granting Vastola's post-conviction motion for a judgment of acquittal on one of the two substantive RICO counts.

Appellants originally were indicted along with nineteen other defendants in a 114 count indictment charging a variety of crimes. By opinion and order dated September 1, 1987, the district court severed the case for separate trials. *United States v. Vastola*, 670 F.Supp. 1244, 1261 (D.N.J. 1987). Vastola and Saka ultimately were tried on a twenty-six count redacted superseding indictment, filed on February 23, 1989, which named Saka in twenty-five counts and Vastola in fourteen. Both appellants were sentenced to total prison terms of twenty years and, in addition, Vastola was ordered to pay fines totalling $70,000 and Saka was ordered to pay fines totalling $185,000.

On appeal, Vastola contests the sufficiency of the evidence to support his convictions for the extortionate collection conspiracy charged in Counts 4 and 9 of the superseding indictment, and the substantive RICO offense charged in Count 2. He also asserts various grounds for reversal of his RICO conspiracy conviction under Count 3, including an alleged defect in the jury instructions and insufficiency of the evidence of his involvement in the predicate acts underlying the conspiracy. Finally, he raises various challenges to the conduct of the trial itself, arguing, in part, that he suffered irreparable prejudice because of the government's denomination of the criminal enterprise as the Vastola Organization, and because of the district court's admission of expert testimony regarding the meaning of loansharking terms used by appellants.

Saka argues that the district court erred as a matter of law when it denied his pretrial motion to suppress tape recordings from the government's electronic surveillance of appellants' communications, on the ground that the government violated the Wiretap Act, 18 U.S.C. § 2510 et seq., when it relinquished custody of the tapes to a private party for enhancement. He also maintains that the district court abused its discretion when it denied his pretrial motion for appointment of new counsel and when it refused to suppress certain evidence seized pursuant to overbroad search warrants.

Finally, the government, in its appeal of the district court's grant of judgment of acquittal for Vastola on Count 1 of the superseding indictment, has advanced the legal question of whether the RICO conviction may stand, notwithstanding Vastola's acquittal of separately charged offenses making up three of the four predicate racketeering acts charged in the indictment.

We have considered the arguments raised by Vastola and Saka to the extent that they relate to both appeals, as Vastola and Saka have adopted each others' arguments pursuant to Fed.R.App.P. 28(i). Based on our review of the record, we agree with Vastola that there was insufficient evidence to support his RICO conviction under Count 2, and will reverse the district court's order entering judgment of conviction and sentence on that count. We also have determined that the district court erred as a matter of law in granting Vastola's motion for judgment of acquittal on Count 1, and therefore will reverse the order challenged in the government's appeal and remand Vastola's case for entry of judgment of conviction on Count 1 and for resentencing. In all other respects, under the applicable standards of review, we see no basis to disturb the district court's order with respect to Vastola, and will affirm his convictions on Counts 3, 4, and 9 of the superseding indictment. We will affirm Saka's convictions on all counts.

## II. THE FACTS

The prosecution's theory, as reflected in its opening statement, was that Vastola

headed a "secret criminal enterprise," the "Vastola Organization," which "encouraged, aided and profited from" the illegal activities of its members. Ranking members of the enterprise were alleged to include Saka, "who came up with most of the fraudulent schemes the organization profited from," and Vastola's cousin, Palmer ("Sonny") Brocco, who carried out Vastola's orders. The enterprise was headquartered at the Video Warehouse in Monmouth County, New Jersey.

The indictment attributed various crimes to the enterprise, including a conspiracy to use and use of extortionate means to collect an extension of credit to John LaMonte in connection with a record purchase from MCA Records, Inc., numerous usurious loans, "bust-out" schemes to defraud suppliers to businesses controlled by the enterprise, and insurance and bankruptcy frauds. We will set forth the circumstances of only the two of these crimes necessary to our discussion.

### 1. The Dwek Loan

Joseph Dwek was an executive at Chams Clothing Company. He testified that when he left the company, he negotiated a financial settlement which ultimately yielded him $40,000 in return for his relinquishment of certain contract rights. When that money was not immediately forthcoming, he began to experience "financial difficulty." A friend of his, Ralph Setton, put him in contact with Saka.

Saka and Dwek met in February, 1985 to discuss Dwek's prospects for obtaining a loan. Saka told Dwek that he could deliver $10,000 in cash within a day which would be payable at an interest rate of $250 per

week. They consummated the deal in a subsequent meeting, at which Sonny Brocco gave Dwek $10,000 in cash. The debt was evidenced by a promissory note which did not contain any interest rate terms.

Dwek testified that he regularly paid the interest on his loan at the Video Warehouse and would give the money to whoever was present, normally, Saka, Sonny Brocco or Nick Massaro. However, he understood Saka to be the obligee. When Dwek's settlement from Chams Clothing was further delayed, he borrowed an additional $5,000 from Saka at an interest rate of $125 per week. Dwek further testified that he saw Vastola at the Video Warehouse about two or three times over a six month period and knew him to be Saka's landlord.

Around this time, Dwek also entered a partnership with Saka to market a perfume developed by a clothing company called Jou Jou. They agreed to become equal partners, with Saka supplying the financing and Dwek, the business expertise. Although Saka and Dwek did not go far in this venture because the "monetary funds" were unavailable, they did form a small corporation for the purpose of effectuating the Jou Jou deal and Saka attempted to flesh out the details of how the profits would be allocated.[1]

In any event, Dwek soon fell behind on his interest payments. In a telephone conversation on May 7, 1985, Brocco did not mince words on the subject of Dwek's lateness:

> I don't appreciate get'n fucked around by you! Ya know what I mean, you said 10:30. You know what time it is now? And you been jerk'n me off for two weeks. Now how do you want to handle

---

1. On July 3, 1985, Saka, in a conversation with an individual identified in the transcript as an "unknown male," stated:

> So now what we're supposed to do is go fifty fifty with Dwek. But now what we're talking about with Dwek we ain't gonna do that, we're gonna tell Dwek listen, you get a third, I get a third, they get a third. That's the way we should do it. Or may give them forty percent, but we want control....

Appendix at 3555.

Saka went on to discuss the level of "salary" which would be paid Dwek, and mentioned that

he and Sonny had been contemplating paying Dwek $500 per week, to which the unknown male responded, "(UI) the five, we gonna pay him five hundred a week?" Saka explained that the salary was "part of our expenses."

In summation, the government argued that the unknown male was Vastola and that the subject of the conversation was the unlawful loan to Dwek. From the context, however, it would seem that Saka was referring to his partnership with Dwek on the Jou Jou perfume deal.

this? Do you want me to come over there and strangle you, is that what you want?

Appendix at 3244.

Dwek understandably replied, "No Sonny." *Id.*

On April 22, 1985, Saka and Brocco assessed the status of Dwek's debt. Saka reminded Brocco that Brocco had given Dwek $10,000 and that Saka had later given him $5,000. They concluded that Dwek owed them $15,000 plus the "juice," and that, of the principal, Brocco was entitled to $2,500. According to the government, Saka then pointed out, "I never squared you with Tommy [Vastola]."[2]

The subject of Dwek's debt also came up in a conversation among Vastola, Saka and Brocco on April 26, 1985. After discussing various other loans, Vastola asked Saka, "what happened with that guy that had the problem with that guy that, uh, remember we met him here?" Saka explained the difficulties Dwek was experiencing in reaching a settlement with Chams Clothing and Vastola, referring to Dwek's former partners at Chams asked if they had gotten "a piece." Brocco then informed Vastola that when Dwek reached a settlement, "they" were going to lay claim to at least part of it. Vastola responded, "Take a piece (UI) give up a little bit, if it wasn't on account of you people. He would have gotten nothing."[3] Brocco questioned whether they had a claim to Dwek's settlement and Saka asserted that "it doesn't hurt to ask. All's he can say is no." To this Vastola urged, "Tell him, he's gotta put somethin' in the side. After all you came here for backup, you had the backup if there had been a problem.... So now you settled."

Dwek settled with Chams Clothing in April, 1985 and paid the $10,000 loan off in one lump sum payment. He paid off the $5,000 loan in September, 1985.

### 2. The MCA Deal

In early 1984, MCA Records, a Los Angeles based corporation, agreed to sell several million "cut-out" records and tapes,[4] valued at approximately $1,750,000, to Salvatore Pisello, an individual connected with Consultants for World Records, Inc. The only document evidencing the transaction was a purchase order from Roulette Records, the guarantor of the sale price. Roulette Records was owned by Morris Levy who was identified in the indictment as Vastola's and Saka's co-conspirator. Although there was no written agreement between MCA and Pisello, MCA officials understood Pisello to be the buyer in the transaction.

Pisello and Levy approached Vastola to find a buyer for the records and Vastola recommended John LaMonte, who owned a record distribution company called Out of the Past, Ltd. LaMonte had served time in a federal penitentiary with Vastola's cousin, Palmer ("Sonny") Brocco, and apparently Brocco suggested LaMonte to Vastola because he owed LaMonte a favor.

Pisello accepted LaMonte as buyer and the deal was consummated in the summer of 1984, when MCA shipped the records, at Roulette's request, to Betaco Enterprises in Brentwood, California, a customer of Pisello, and to LaMonte's company, Out of the Past, Ltd., in Darby, Pennsylvania. In 1984, MCA received sporadic payments for the records shipped to Pennsylvania from Pisello's company, Consultants for World Records, Inc., but no payments were forthcoming from January 1985 on. At that time, the balance due was approximately $800,000. MCA then looked to Roulette Records as the guarantor and eventually asked Pisello for assistance in securing the return of the merchandise. Out of the Past sent back a substantial number of records in mid–1985, leaving an outstanding balance of approximately $350,000.

---

**2.** Although this statement appears in the transcript, Vastola claims that it is not on the tape. In its answering brief, the government never directly asserts that the statement is on the tape but instead, argues that Vastola waived any objections to the transcript because he failed to raise them at trial.

**3.** "UI" refers to unintelligible.

**4.** "Cut-out" is an industry term for obsolete merchandise. Appendix at 853.

MCA's Chief Financial Officer, Daniel McGill, then repeatedly telephoned Morris Levy and his associate, Howard Fisher, demanding payment of the remainder of the debt. As a result of those conversations, MCA received two additional checks, a check for $125,000 dated October 9, 1985, and a check for $120,000 dated January 29, 1986. The remaining balance of $100,000 was never paid to MCA.

The deal unravelled because LaMonte had failed to pay for the merchandise he received from MCA. LaMonte was expected to pay for the merchandise itself plus $300,000 in profits, which was to be divided equally among Pisello, Levy and Vastola as partners in the transaction.[5] LaMonte paid about $30,000 in cash. The remainder of his payments were in notes, most of which bounced.

As Vastola's and Levy's frustration with LaMonte mounted, they, along with Saka and Brocco, began formulating plans to recover either the balance due them or the merchandise. At the same time, Levy, with recurring frequency, blamed Vastola for bringing LaMonte into the deal and exerted pressure on him to get LaMonte to pay.

On December 18, 1984, Vastola instructed his cousin Brocco to get hold of LaMonte because "every fuckin' body is screamin' over those fuckin' payments, the notes, and that...." He added that Levy and his associates were holding Brocco responsible for LaMonte's conduct because he had assisted LaMonte in negotiating the deal and that "[t]hey want[ed] [Brocco] to sit in the fuckin' joint, [LaMonte's ware-house] there and don't make a record go in and out until this money's paid." Later that day, when Fisher called Video Warehouse, Saka assured him that he, Brocco, and Vastola intended to visit LaMonte, and that Vastola planned to "read [LaMonte] the riot act."

The following day, Vastola told Saka that he planned to install Brocco in LaMonte's business to ensure that no merchandise or money was removed before Levy was paid: "the money's got to be taken and sent to Morris [Levy]. I don't care what [La-Monte's] business is."

On January 10, 1985, Brocco informed Vastola that LaMonte had disclaimed responsibility for any debt to MCA on the ground that he was liable only to World Wide Consultants.[6] Vastola responded: "[T]his guy is aggravating me, you know.... I tell you the truth he had me at a stage last night, I'll tell you the truth, that if I had him in front of me I would have broke his ass." Less than two hours later, Vastola again called Brocco and instructed him to drive to LaMonte's company and pick up a check for $629,000. He added that if LaMonte failed to cooperate, he would "put him in a fuckin' hospital."

Vastola called Brocco again on January 10, 1985, and reiterated his demand that Brocco pick up the check for $629,000 from LaMonte. Apparently, Pisello was in town and had delayed his return trip to California until he received payment from LaMonte. Vastola, pressured by Pisello, again expressed his exasperation with LaMonte and indicated that he was practically resolved to turn LaMonte over to his part-

---

**5.** On appeal, Vastola strenuously denies that he was partners with Pisello and Levy and insists that he was aligned with LaMonte. Although the record is somewhat unclear as to whether Vastola was involved in the early stages of the deal, there is considerable support for the government's proposition that Vastola formed a partnership with Levy and Pisello, at least as of the time that LaMonte was brought into the deal. In an argument between Vastola and Levy over Vastola's entitlement to a percentage of profits derived from a sale made before the delivery to LaMonte, the following exchange took place:

> VASTOLA: So we're, we're only partners with the, with the losses and not the wins?

LEVY: You weren't a partner on that first part of the load.
VASTOLA: Why not?
LEVY: Because you weren't. You came in with John [LaMonte]. You came in with John and, and ...
VASTOLA: I was in with me, you and him and your partner before John got in. Me, you and him and your partner was in with that six million records, we'll cut it up three ways. Appendix at 3751–52.

**6.** The transcript refers to "World Wide Consultants." Given the similarity in names, we believe that the reference is to Pisello's company, "Consultants for World Records, Inc."

ners so that they could attempt collection from him: "[I]t's going to come to the point I'm gonna tell Rudy, ah ... Sal [Pisello], everybody, go over there, do whatever you want." Apparently, Brocco was unable to obtain the check from LaMonte.

At some point in the ensuing month, LaMonte sent notes worth $300,000 to Pisello and Levy in partial payment of his debt. Unfortunately, the notes bounced and Pisello and Levy had to pay the banks $90,000 to cover them. On February 13, 1985, Vastola complained to Saka that he probably would be held responsible for $30,000 of the bank charge, because it was "a three way partnership, it's 30, 30, 30." He further opined that the situation with LaMonte was becoming so disastrous that it might become necessary "to put two guys there to control [LaMonte's] whole business." Saka agreed, and suggested that they might be doing LaMonte a favor because his business judgment was so poor.

Over the ensuing months, Vastola, Saka, and Levy repeatedly discussed the possibility of seizing control of LaMonte's business to satisfy his debt. On April 8, 1985, Vastola, Saka and Levy had a three-way conversation in which they considered whether LaMonte could repay the debt at a rate of $30,000 per week. Levy believed that LaMonte had money "coming in by the thousands" and that he could meet that payment schedule. On the subject of Brocco's apparent inability to get LaMonte to pay, Saka suggested that Brocco felt a certain amount of loyalty to LaMonte. Vastola responded: "He can't have an obligation to him over me.... His first obligation is here."

In May, 1985, during the course of a meeting between Vastola, Brocco, Saka and LaMonte, Vastola punched LaMonte in the nose, causing him to spend at least four days in a hospital. Vastola and Saka agreed that LaMonte deserved to be punched because he had gotten "totally out of line." Later, referring to the incident, Saka said to Levy and Vastola that he could not understand how after Vastola "busted his jaw" LaMonte "still [had] the balls not to come up with the money."[7]

On September 23, 1985, a two hour meeting, attended by Vastola, Saka, Levy, Fisher, and Dominick Canterino took place at Roulette's Manhattan offices.[8] The primary topic of conversation was LaMonte's debt. After considerable haggling over who was responsible for LaMonte's behavior, the parties agreed to make LaMonte ship the records back to MCA the following Friday:

> CANTERINO: How do we resolve this now?
>
> VASTOLA: All right we're resolving it this way if it's all right with everybody. We're going over there Friday morning, we're gonna make him ship back all the stuff that ...
>
> SAKA: Two hundred forty four thousand.
>
> LEVY: Even a little more.
>
> SAKA: Let's ship back four hundred.

Appendix at 3845.

Later, when Canterino asked Vastola whether he felt that LaMonte was a "controllable guy," Vastola assured him, "It's gone, it's gone."

On October 3, 1985, Vastola told Fisher that LaMonte and his family had disappeared. He had "people knockin' on his windows" but they had seen no sign of the LaMontes.

### III. DISCUSSION

#### A. GOVERNMENT'S APPEAL

##### 1. Jurisdiction

The threshold question with respect to the government's appeal is jurisdictional,

---

**7.** It appears that LaMonte's period of active cooperation with the government began during his hospitalization, as LaMonte became an informant on May 18, 1985.

**8.** Canterino, Levy and Fisher were charged in the original indictment filed in this case and, following a joint trial, were found guilty under 18 U.S.C. § 894 of an extortionate collection conspiracy in connection with the MCA deal. The district court granted Fisher's motion for judgment of acquittal but sustained Canterino's and Levy's convictions. *United States v. Levy,* 694 F.Supp. 1136 (D.N.J.1988). This court affirmed by judgment order dated December 6, 1989.

as Vastola has moved to dismiss the appeal because of the government's failure to file its notice of appeal within thirty days of the district court's order granting Vastola's motion for judgment of acquittal on Count 1.[9] *See* Fed.R.App.P. 4(b).[10]

On April 28, 1989, the district court orally announced its decision on Vastola's motion and entered its order granting it that same day. Apparently, there was some confusion in the United States Attorney's office and within the district court's chambers as to whether the order actually was entered on April 28, 1989, because, following inquiries made by Assistant United States Attorney Repetto, the district court on May 30, 1989, issued a second order, entered on June 1, 1989, granting the judgment of acquittal. The government's notice of appeal, filed on June 12, 1989, recited that the government was appealing from the order entered on June 1, 1989.

As Vastola correctly points out in his motion to dismiss, the timeliness of the government's notice of appeal must be determined either from the date of the April 28, 1989, order or the date of Saka's notice of appeal, as that was the last notice of appeal filed by "any defendant." Rule 4(b)(ii). The district court's entry of the second order on June 1, 1989, could not, in itself, extend the time for the filing of the notice of appeal because the order entered on April 28, 1989, was not vacated by that order, or insofar as we are aware, by any other order. As Saka's notice of appeal was filed on May 8, 1989, the latest the government could have timely filed its notice of appeal was June 7, 1989. Therefore, barring any time extensions, the government's notice of appeal was filed five days late.

However, by letter dated October 18, 1989, the government moved for a postponement of this court's decision on the

motion to dismiss, as the government was seeking an extension of time of the notice period from the district court pursuant to Rule 4(b). The postponement was allowed and the district court initially denied the government's motion by order dated November 13, 1989, but, pursuant to the government's motion for reconsideration, by order dated December 5, 1989, granted the extension of time on the ground of excusable neglect.

■ The issue before us is whether the district court retained subject matter jurisdiction to grant a time extension for the government's filing of a notice of appeal. We conclude that it did and therefore deny the motion to dismiss the government's appeal.

■ An appellate court cannot enlarge the time for an appeal because the absence of timely notice deprives it of subject matter jurisdiction. *United States v. Robinson*, 361 U.S. 220, 224, 80 S.Ct. 282, 285, 4 L.Ed.2d 259 (1960); *United States v. Grana*, 864 F.2d 312, 314 (3d Cir.1989); *Braden v. University of Pittsburgh*, 552 F.2d 948, 950–51 (3d Cir.1977). However, in limited circumstances, the district court can extend the period for filing of a notice of appeal. Fed.R.App.P. 4(b) provides that:

> Upon a showing of excusable neglect the district court may, *before or after the time has expired*, with or without motion and notice, extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision. [Emphasis supplied.]

Several courts of appeals have construed this provision to mean that, in criminal cases, a notice of appeal filed within thirty days after the expiration of the filing period functions as a request for an extension of time, which may be granted retroac-

---

9. The parties agree that we have jurisdiction over Vastola's and Saka's appeals under 28 U.S.C. § 1291 and that, apart from the dispute regarding the timeliness of the government's notice of appeal, we have jurisdiction over the government's appeal under 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

10. Rule 4(b) provides:

> When an appeal by the government is authorized by statute, the notice of appeal shall be filed in the district court within 30 days after entry of (i) the judgment or order appealed from or (ii) a notice of appeal by any defendant.

Fed.R.App.P. 4(b).

tively by the district court after the expiration of the thirty day extension period. *See, e.g., United States v. Rothseiden,* 680 F.2d 96, 98 (11th Cir.1982) ("The practice under FRAP 4(b) is that if the untimely notice of appeal is filed within the extended 30–day period, then we will consider the filing as a motion made to the district court for extension of time for excusable neglect."). *See also United States v. Kaden,* 819 F.2d 813, 817 (7th Cir.1987); *United States v. Golding,* 739 F.2d 183 (5th Cir. 1984).

We have yet to adopt this construction of Rule 4(b) followed by our colleagues on the Courts of Appeals for the Fifth, Seventh and Eleventh Circuits. *But see United States v. McKnight,* 593 F.2d 230, 233 (3d Cir.1979) (dismissing appeal without prejudice where notice of appeal was untimely under Rule 4(a) but was filed before the expiration of the thirty day time period for a finding of excusable neglect because the court of appeals lacked the power to remand the matter to the district court). Vastola has interpreted our decision in *United States v. Grana,* 864 F.2d at 312, to mean that we have expressly rejected the proposition that a district court retains the power to grant a time extension under Rule 4(b) after the expiration of the extended thirty day filing period. However, *Grana* is inapposite to the situation here, as our decision in that case did not hinge on our construction of the time extension provision in Rule 4(b).

In *Grana,* the appellant, an inmate at a federal prison, filed a notice of appeal from a final order entered April 18, 1988, on May 13, 1988, fifteen days after the appeal period expired. 864 F.2d at 314. The appellant claimed that he had not received the district court's order until May 5, 1988, due to negligence on the part of prison personnel. *Id.* Relying on *Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), wherein the Supreme Court held that the timeliness of a *pro se* inmate's notice of appeal must be judged from the time of its delivery to prison authorities rather than from the time of its filing, we held that the notice of appeal was timely if filed within ten days of the inmate's receipt of the district court's final order. *Id.* at 316. We reasoned that prison delays in transmitting a final order to an inmate are just as destructive of the inmate's rights as are delays in filing his papers in court. *Id.* Accordingly, we remanded to the district court for a factual finding as to the date the inmate received the order. The decision in *Grana* thus rested on very different principles than *Kaden, Rothseiden,* and *Golding.*[11]

■ Vastola also argues that the construction of Rule 4(b) urged by the government indefinitely continues the district court's jurisdiction to rehabilitate untimely notices of appeal. We reject this argument, as Rule 4(b) contains an inherent limitation on the district court's ability to grant a time extension. Although on its face, Rule 4(b) confers indefinite jurisdiction on the district court to grant a time extension, if no notice of appeal has been filed within the thirty day extension period, then the district court's order would have no force or effect, as the court can only extend the filing period for thirty days. The key question under Rule 4(b) is when the notice of appeal was filed, not when the time extension was granted.[12]

■ We have no doubt that the courts in *Kaden, Rothseiden,* and *Golding* were correct in recognizing the power of a district

---

**11.** In fact, in *Grana,* we expressly stated that we were not relying on the extension provisions of Rule 4(b). The inmate in *Grana,* in seeking to obtain immediate appellate review, pointed out that as of May 5, 1988, when he received notice of the final order, he still could have filed a motion for a time extension under Rule 4(b). *Id.* at 314 n. 6. We declined to rely on the "procedural avenues for attaining appellate review" by extension of the time to appeal provided in Rule 4(b) because they are "subject to district court discretion and therefore do not compensate for the right to appeal which is lost due to prison delay." *Id.*

**12.** Vastola's final argument, that the so-called "legal fiction" proposed by the government should apply only to appeals by defendants, does not require extensive discussion, as it is contrary to the literal language of Rule 4(b), which treats appeals by defendants and the government equally.

court to grant a time extension in a criminal case after the expiration of the extended notice period, as their construction of Rule 4(b) is consistent with its literal language, which authorizes a district court to make a finding of excusable neglect "before or after the time has expired." In view of the district court's unchallenged finding of excusable neglect, we conclude that the government's notice of appeal filed June 12, 1989, from the order of April 28, 1989, was timely within the thirty day extension period. Accordingly, we deny Vastola's motion to dismiss the government's appeal.

### 2. Inconsistency of the Verdict on Count 1

█ The district court granted Vastola's motion for judgment of acquittal with regard to Count 1 of the superseding indictment, which charged him with conducting an enterprise through a pattern of racketeering in violation of RICO, 18 U.S.C. § 1962(c). Count 1 alleged four predicate acts of racketeering, each of which was defined through reference to various substantive offenses charged in separate counts of the indictment. The first racketeering act was Vastola's participation in a conspiracy to use and use of extortionate means to collect the extension of credit to John Lamonte in connection with the MCA deal, as charged in Counts 4, 5, 9, and 10. The second was Vastola's involvement in a conspiracy to make extortionate loans and to use extortionate means to collect them, as charged in Counts 6 and 7. The third racketeering act concerned a particular extortionate loan to Daniel Zack, as charged in Count 11. And the fourth was his fraudulent concealment and transfer of property of Dispodype, Inc., a company controlled by Saka, in violation of the bankruptcy laws,

as charged in Counts 24 and 26. Although the jury either deadlocked or acquitted Vastola of all offenses underlying the four racketeering acts except for those charged in Counts 4 and 9, it found him guilty of the RICO charge.

The district court granted Vastola's motion for judgment of acquittal, reasoning that the jury could not possibly have found a "pattern of racketeering activity" as required by section 1962(c), given that it found Vastola guilty of only one of the four predicate racketeering acts. According to the judge, the conviction on the RICO count was not simply a problem of inconsistency in the jury verdict. Rather, he decided that an essential element of the section 1962(c) offense was lacking, as that statute requires the government to prove at least two predicate acts of racketeering. We now reverse.

There is no question that the jury verdict was inconsistent. By its plain language, section 1962(c) requires the government to show a "pattern of racketeering activity," which, under section 1961(5), must be based on proof of "at least two acts of racketeering activity."[13] The jury's acquittal or deadlock on the offenses underlying three of the four alleged racketeering acts was incompatible with its conviction on the RICO count. However, as the problem is purely one of inconsistency in the verdict, it is controlled by *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

In *Powell*, the defendant was acquitted of charges of conspiracy to possess and possession of cocaine with intent to distribute, but was convicted under 21 U.S.C. § 843(b) of using a telephone to facilitate the commission of the conspiracy and possession offenses. *Id.* at 59–60, 105 S.Ct. at

---

**13.** Of course, bare proof of two racketeering acts is not sufficient to prove a "pattern" under the RICO statute. As this court explained in *Rose v. Bartle*, 871 F.2d 331 (3d Cir.1989), the "crucial requirement to establish a pattern is 'continuity plus relationship ... combin[ing] to produce a pattern.'" *Id.* at 364 (quoting *Sedima v. S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985)). Thus, the predicate acts must be relat-

ed in "'purpose, results, participants, victims, or methods of commission ... so as not to be isolated events.'" *Id.* (citations omitted).

There is no allegation in this case, however, that the predicate acts charged in the indictment, if proven, would be insufficient to show a "pattern" under section 1961(5). Indeed, the first three acts would clearly constitute a pattern as they all involve extortionate activities.

474. The Court of Appeals for the Ninth Circuit upheld the district court's grant of judgment of acquittal on the section 843(b) conviction, reasoning that an acquittal on the predicate felony, that is, the conspiracy, logically precluded a conviction on the compound felony of using a telephone to facilitate the conspiracy.

In a unanimous decision, the Supreme Court reversed, reaffirming its holding in *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) [14] that jury verdicts in criminal cases cannot be set aside solely on the ground of inconsistency. As the Court explained, the *Dunn* rule applied with equal force to the facts in *Powell* because it was impossible to tell whether the inconsistency favored the defendant or the government: "it is unclear whose ox has been gored." *Id.* 469 U.S. at 65, 105 S.Ct. at 477. While it was possible that the jury did not find sufficient evidence to convict on the predicate offenses and misapplied the law on the compound offense, the converse was equally possible, namely that it was the acquittals which were suspect. Given that the defendant's protection against double jeopardy precluded the government from seeking appellate review of the acquittals, the rule against overturning the conviction because of the inconsistency did "not necessarily ... [create] a windfall to the Government at the defendant's expense." *Id.* at 65, 105 S.Ct. at 476. Conceivably, it was the defendant who enjoyed a windfall due to the jury's lenity.

The Court specifically rejected the defendant's argument that inconsistent verdicts in the compound felony context warrant an exception to the *Dunn* rule. The defendant maintained that an acquittal on the predicate offenses underlying a compound felony conviction necessarily means that there was insufficient evidence to prove the compound felony. *Id.* at 68, 105 S.Ct. at 478. According to the Court, the defendant's argument showed a

> misunderstand[ing of] the nature of the inconsistent verdict problem. Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper-the one that the jury 'really meant.' This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent.

*Id.*

As this case is virtually indistinguishable from *Powell*, we conclude that the inconsistent verdicts did not justify the district court's grant of judgment of acquittal. The jury was properly instructed that the government had to prove beyond a reasonable doubt *each* of the five essential elements of section 1962(c), including the defendant's participation in a "pattern of racketeering." Specifically with regard to the "pattern of racketeering" requirement, the district court made it clear that two predicate racketeering acts were required and that a guilty verdict on two substantive offenses would not be sufficient to establish a "pattern" if those offenses formed part of the same racketeering act described in Count 1 of the indictment:

> Paragraph 4 of Count 1 charges that defendant Gaetano Vastola committed 4 acts of racketeering.... You will find that a number of individual Racketeering Acts (Racketeering Act 1, 2 [and] 4 ...) are comprised of more than one count,

---

**14.** In *Dunn*, the defendant was convicted of maintaining a common law nuisance by keeping intoxicating liquor on his premises but was acquitted on charges of unlawful possession and sale of the liquor. The Court rejected the defendant's claim that the conviction should be set aside because of its inconsistency with the acquittals, reasoning that the defendant's argument unjustifiably assumed that the acquittals were somehow more reliable than the conviction:

> 'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of power which they had no right to exercise, but to which they were disposed through lenity.'
> *Id.* at 393, 52 S.Ct. at 190.

thus a particular defendant is charged with more than one offense within that Racketeering Act. This is perfectly proper. However, I instruct you *in order to satisfy that Racketeering Act you must unanimously agree that the defendant ... committed at least one of the offenses presented before you can find him guilty of that Racketeering Act.* Of course you may find that the defendant committed more than one of the offenses but at least one is essential and the finding must be unanimous. *The Government must prove beyond a reasonable doubt that each defendant committed, or knowingly and willfully aided or abetted in the commission of, at least two of the racketeering acts with which he is charged.*

Appendix at 2746 (emphasis supplied).

As the jury was properly instructed as to the RICO charge, we would be no more justified in holding that the jury disregarded those instructions than we would be in speculating that the jury disregarded the weight of the evidence when acquitting Vastola of the predicate offenses.

Notwithstanding the clarity of the jury charge, Vastola argues that a note sent out by the jury during its deliberations indicates that it was confused as to the difference between a "racketeering act" and the various offenses making up each of the four alleged acts. In its note, the jury wrote:

We would like a legal instruction regarding the RICO counts. To some extent, all three RICO counts are discussed together in the same charge. We are not completely sure whether or not the 'two acts of racketeering activity' requirement applies to all three RICO counts or

just to count 1. In other words, if we found one defendant not guilty of other *racketeering counts* (4–16, 18, 19, 21, 22, 24, 25 and 26) could we still find that defendant guilty on count 2 or count 3?

Appendix at 2885 (emphasis supplied).

According to Vastola, the jury's reference to "racketeering counts" indicates that "the jury considered *each* of the enumerated counts to be racketeering acts, despite the fact that Count 1 encompassed only four racketeering acts." Thus, Vastola asserts, this case is unlike *Powell* because the court can rationally infer that the apparent inconsistency in the verdict was not a product of lenity but was attributable to the jury's erroneous belief that Vastola's guilt on Counts 4 and 9 satisfied the two predicate act requirement for the section 1962(c) offense.

Although Vastola's interpretation of the note is plausible, it is not conclusive. It is equally possible that, by "racketeering counts," the jury meant to refer to the offenses subsumed in each of the four racketeering acts charged in Count 1. The note simply is too ambiguous to justify our speculation into the jury's thought processes. The only clear conclusion that can be drawn from the note is that the jury fully understood that it needed to find two predicate racketeering acts to convict under Count 1.

Vastola further suggests that, in the RICO context, acquittals on separately charged predicate offenses render a RICO conviction inherently suspect because, to assess guilt under the RICO statute, the jury first has to determine whether the defendant committed the individual offenses subsumed in the RICO charge.[15] In

---

**15.** Vastola buttresses his argument by pointing to the following jury instruction:

2. *Consequences of Other Verdict*

All of the racketeering acts charged in paragraph 4 of Count 1 relate to all but five of the Counts 4 through 26 of this Indictment. If you find a defendant not guilty of one of those specific counts, you may not consider that count as one of the two racketeering acts required under Count 1.

Appendix at 2746.

Vastola argues that, under this instruction, the jury was required to consider the predicate acts before passing judgment on the RICO charge.

This argument is precluded by unequivocal language in *Powell* which negates the proposition that jury instructions regarding the interdependency of charges have any bearing on the inconsistent verdict problem:

[The] problem is not altered when the trial court instructs the jury that it must find the defendant guilty of the predicate offense to convict on the substantive offense. Although

other words, the predicate acts are "building blocks" which make up the pattern of racketeering activity, without which the jury could not make an intelligible decision as to the RICO charge. Accordingly, Vastola suggests, the problem here is not merely one of inconsistency in the jury verdict. Rather, the acquittals on the non-RICO counts indicate that the jury failed to find an essential element of the RICO offense, namely, the pattern of racketeering activity.

We find this argument unpersuasive as it rests upon a fallacious assumption that the acquittals on the predicate acts can be treated as the functional equivalent of a special verdict on the RICO offense. While in some cases, we have inferred from acquittals on particular predicate offenses that the offenses were not the basis for the jury's general verdict of guilt on a RICO offense, *United States v. Riccobene*, 709 F.2d 214, 229 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), we have only done so where the only other possible conclusion would be that the jury returned inconsistent verdicts. That is, we will not assume an inconsistent verdict where an alternative explanation is present, namely, that the jury relied on alternative predicate acts when convicting on the RICO charge. Where, as here, the jury acquits on all but one of the separately charged predicate acts, we have no choice but to conclude that the verdicts are inconsistent.[16] As such, the case is controlled by *Powell*.

Indeed, we point out that the situation here is virtually identical to the one in *Powell*. The offenses subject to the inconsistent verdict in *Powell* also were interdependent, as the jury could not rationally find guilt on the section 843(b) offense without reaching some conclusion as to the defendant's involvement in the conspiracy.

As in *Powell*, we have no way of knowing whether the jury convicted on the RICO count because it was convinced of Vastola's guilt on the predicate acts, yet, at the eleventh hour, acquitted him of those acts out of lenity or some other improper motivation. In view of the nature of the inconsistency in *Powell*, Vastola's attempt to distinguish that case must fail.

Finally, we note that other appellate courts have applied *Powell* in a RICO context. *See, e.g. United States v. Tinsley*, 800 F.2d 448, 450–52 (4th Cir.1986); *United States v. Neapolitan*, 791 F.2d 489, 505 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). *Cf. United States v. Chang An–Lo*, 851 F.2d 547, 560 (2d Cir.), *cert. denied*, —— U.S. —— 109 S.Ct. 493, 102 L.Ed.2d 530 (1988) (even assuming that conviction on predicate conspiracy was inconsistent with acquittal on RICO charge, reversal was not possible). We agree with our colleagues on the Courts of Appeals for the Second, Fourth, and Seventh Circuits that there is no legitimate basis for grafting an exception to *Powell* for RICO offenses.

We express no opinion as to whether the evidence of Vastola's participation in the predicate acts was sufficient to support his RICO conviction, as the sole basis for the grant of judgment of acquittal was the district court's erroneous conclusion that *Powell* did not apply to inconsistent verdicts in the RICO context. As the government acknowledged at oral argument, Vastola is free to appeal directly from the judgment of conviction and sentence on Count 1 after its reinstatement by the district court. Of course, if he chooses to do so, he will be barred from rearguing any issues which were decided against him in this appeal. However, we do not decide

---

such an instruction might indicate that the counts are no longer independent, if inconsistent verdicts are nevertheless reached those verdicts still are likely to be the result of mistake, or lenity, and therefore are subject to the *Dunn* rationale.
469 U.S. at 68, 105 S.Ct. at 478–79.

**16.** Interestingly, this case demonstrates application of both the *Riccobene* and the *Powell* principles. As we will later discuss, under *Ricco-*

*bene*, we can infer from the jury's special interrogatory on Count 2 the basis for its general verdict of guilt on Count 3, which charged Vastola with conspiring to conduct the affairs of the enterprise through the collection of unlawful debt. To reach any other conclusion, we would have to assume an inconsistency between the verdicts on Counts 2 and 3, as they both relied on the same predicate acts.

any questions concerning the sufficiency of the evidence on Count 1 as they are not squarely before us at this time.[17]

In view of the foregoing, we will reverse the district court's grant of judgment of acquittal for Vastola on Count 1 and remand for reinstatement of the conviction and sentencing, without prejudice as to any other issues except those decided on this appeal pertaining to his conviction on that count.

## B. SUFFICIENCY OF THE EVIDENCE ON COUNT 2

■ Vastola maintains that there was insufficient evidence to support his conviction under section 1962(c) for conducting a criminal enterprise through the collection of unlawful debt, as charged in Count 2. The jury indicated in a special interrogatory that the sole predicate act on which it based its verdict with regard to Vastola was his participation in the unlawful debt collection from Joseph Dwek. On appeal, Vastola does not challenge the sufficiency of the evidence to support the jury's finding of a criminal enterprise but has limited his argument to the circumstances surrounding the Dwek loan.

As an appellate court, we may not disturb a jury's factual findings if they are reasonably based on the record developed at trial. We must uphold the verdict if "the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt." *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Leon*, 739 F.2d 885, 890 (3d Cir. 1984). Furthermore, as recently reaffirmed in *United States v. Sandini*, 888 F.2d 300 (3d Cir.1989), the evidence " 'does not have to be inconsistent with every conclusion save that of guilt if it does establish a case from which a jury can find the defendant guilty beyond a reasonable doubt.' " *Id.* at 311 (quoting *United States v. Cooper*, 567 F.2d 252, 254 (3d Cir.1977)). Vastola thus bears a heavy burden in convincing this court that the evidence was insufficient on Count 2. We believe that he has carried it.

To prove a RICO violation predicated upon a collection of unlawful debt, the government had to show that Vastola participated in the enterprise through the collection or attempted collection of a debt which was usurious under state or federal law.[18] 18 U.S.C. § 1961(6)(A) (defining an "unlawful debt"). *See United States v. Pepe*, 747 F.2d 632, 674 (11th Cir.1984) (upholding RICO convictions predicated upon attempted collection of unlawful debt). Here, there is no dispute that the loan to Dwek was usurious under New Jersey law, as the weekly interest charged on the loan corresponded to an annual interest rate of 130%. *See* N.J.Stat.Ann. § 2C:21–19 (West Supp.1989). Vastola ar-

---

**17.** It might be argued that Vastola's challenge to the sufficiency of the evidence to support his RICO conspiracy conviction under Count 3 has placed in issue the sufficiency of the evidence with respect to Count 1, as the offense charged in Count 3 rested, in part, on the same pattern of racketeering activity charged in Count 1. However, in our review of Vastola's arguments raised with respect to Count 3, we have found it unnecessary to examine in detail the evidence regarding the pattern of racketeering activity, as we have determined that his RICO conspiracy conviction must stand on the basis of his involvement in the collection of an unlawful debt from Joseph Dwek. Furthermore, in our view, Vastola has not had a full and fair opportunity to frame the issues as they relate specifically to Count 1.

**18.** It is noteworthy that section 1962(c) does not require proof of extortionate activity to estab-

lish a RICO violation predicated upon the "collection of unlawful debt." In this regard, the "unlawful debt" prong of section 1962(c) may be contrasted to the "pattern of racketeering" prong. If the government seeks to prove a RICO offense predicated upon a pattern of racketeering acts, it is confined to charging the predicate offenses included in section 1961(1). Of these offenses, the only ones which might arise out of the same transaction as a usurious loan are those chargeable under section 1961(1)(A), which brings within the purview of section 1962(c) "act[s] or threat[s] involving ... extortion ... chargeable under State law," and indictable offenses under 18 U.S.C. §§ 891–94 (relating to extortionate credit transactions) and under section 1951, the Hobbs Act. *See* section 1961(1)(B). All of the above offenses require a showing of extortionate activity.

gues, however, that there was legally insufficient evidence linking him to the loan.

Although the evidence was overwhelming that Vastola supervised the collection of unlawful debts by his subordinates within the enterprise,[19] the evidence establishing Vastola's involvement in the Dwek affair was sparse. The government places heavy reliance on three tape-recorded conversations, the April 22, 1985, conversation in which Saka stated to Brocco, "I never squared you with Tommy," the April 26, 1985, conversation between Vastola, Saka, and Brocco in which Vastola urged Saka to take "a piece" of Dwek's settlement, and the July 3, 1985, conversation between Saka and the unknown male who the prosecutor, in his summation, claimed was Vastola.

Although the words, "I never squared you with Tommy" appear in the transcript, Vastola strenuously denies that the words are on the tape. The government in its brief never directly asserts that the words are on the tape but argues only that this court is bound to accept what it believes was the jury's factual finding that the words appear on the tape because Vastola's failure to object to the transcript at trial precludes him from challenging its accuracy in this appeal. We find it unnecessary to become embroiled in the parties' dispute over the accuracy of the transcript because, even if the transcript is accurate, the statement attributed to Saka would provide only tenuous support for a finding that Vastola supervised Saka's and Brocco's collection of the debt from Dwek.[20]

The second portion of the transcript cited by the government is Saka's conversation with the "unknown male" in which the unknown male, referring to Dwek, asked, "... we gonna pay him five hundred a week?" This statement provides no support whatsoever for the government's case. Given Saka's references to "go[ing] fifty fifty with Dwek" and to Dwek's prospective salary, it seems clear that the parties to the conversation were discussing Dwek's partnership with Saka on the Jou Jou deal rather than the debt. Therefore, even if the unknown male was Vastola, which is not beyond dispute, the conversation has no bearing on Vastola's guilt with respect to Count 2.

The only hard evidence linking Vastola to the Dwek loan is Vastola's conversation with Saka and Brocco on April 26, 1985, in which he urged them to "[t]ake a piece" of Dwek's settlement with Cham Clothing, presumably to collect the unlawful debt. He further stated: "Tell him, he's gotta put somethin' on the side. After all you came here for backup, you had the backup if there had been a problem.... So now you settled." Arguably, this evidence, coupled with evidence of Vastola's involvement in other loans, could be interpreted to mean that Vastola instructed Saka on how to proceed in collecting the debt. Also, it might be construed to mean that Vastola had authorized use of the criminal enterprise's resources, that is, the "backup," in the collection process.

However, the inferences which we might draw from these remarks are highly speculative. We further note that according to Dwek's own testimony, he recognized Vastola but had no direct dealings with him. Although we appreciate the fact that Vastola's lack of contact with Dwek is not dispositive, as the government's theory was that Vastola supervised the collection activities of Saka and Brocco, the remarks highlighted by the government do not establish that Vastola played a supervisory role in

---

**19.** In a conversation on July 19, 1985, Jerry Gabonelli called Saka to inquire about the status of a $5000 advance he had requested on a $20,000 loan. Saka explained that Vastola was out of town and that no money could be advanced until Vastola gave his approval:

SAKA: ... Now if Tommy okays it you can have it. You know, as soon as he gets back, no problem.
GABONELLI: There is no possibility of me gettin' it, ah, today.

SAKA: No, because he's not here.
Appendix at 3549–50.

**20.** It is of course true that Vastola's failure to object to the transcript at trial would have no bearing on our evaluation of the sufficiency of the evidence against him, because the transcript is not evidence. If the words do not appear on the tape, then a rational jury could not rely on them as evidence of Vastola's guilt.

the transaction. Thus, even when viewed in a light most favorable to the government, the evidence is not legally sufficient to establish that Vastola collected or attempted to collect an unlawful debt from Dwek. In view of the paucity of the evidence against him, we must reverse Vastola's conviction on Count 2 and direct his acquittal on that count.

## C. THE RICO CONSPIRACY

In Count 3, the indictment charged Vastola and Saka with an agreement to conduct the affairs of the enterprise through a pattern of racketeering activity, as defined in Count 1, and through a collection of various unlawful debts enumerated in Count 2, in violation of section 1962(d). The jury indicated in a special interrogatory on Count 3 that it had based its verdict on both a pattern of racketeering activity and on the collection of unlawful debt. On appeal, Vastola argues that his RICO conspiracy conviction must be set aside because the district court misinstructed the jury as to the pattern of racketeering requirement and because the evidence was legally insufficient to prove that he committed the predicate acts, under either of the government's theories.

The government argues that even if the evidence concerning the Dwek loan was insufficient to support Vastola's conviction on Count 2, it was sufficient to support his RICO conspiracy conviction under Count 3. Vastola, in turn, argues that even if the evidence proved his guilt of the Dwek collection, that alone could not sustain his RICO conspiracy conviction. He asserts that because the special interrogatory on Count 3 did not indicate which unlawful debt collection the jury relied upon in reaching its verdict, the court must find that the evidence was sufficient with respect to each alleged act. Thus, the threshold question before us is whether we can extrapolate from the jury's special interrogatory on Count 2 the basis for its

verdict on Count 3. There is no question that we can.

■ It is true that a RICO conviction predicated upon multiple racketeering acts cannot stand where the evidence of any one of the underlying acts is legally insufficient and the court is unable to determine which act formed the basis for the conviction. *United States v. Brown*, 583 F.2d 659, 669 (3d Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). However, in *United States v. Riccobene*, 709 F.2d at 228, we held that there is no *Brown* problem when "the reviewing court can determine that the jury did not rely on the challenged predicate offense when reaching its verdict on the RICO charge."

*Riccobene* completely defeats Vastola's argument that the Dwek debt alone would be insufficient, as its facts are strikingly similar to the situation here. In that case, the defendant was acquitted of a gambling offense identified as one of several predicate racketeering acts supporting his RICO conspiracy conviction. Relying on *Brown*, he argued that his RICO conviction had to be reversed because the jury had delivered a general verdict which may have been based on the same evidence it discounted when acquitting him of the gambling charge. 709 F.2d at 229. In rejecting this argument, we explained that, to apply *Brown*, we would have to assume that the jury returned inconsistent verdicts on the two charges. *Id.* at 230. Rather than assuming that the jury acted irrationally, we decided that the acquittal "serve[d] a function analogous to a special interrogatory" and therefore, it precluded application of *Brown*. *Id.* at 229.

■ As in *Riccobene*, we would have to infer inconsistent verdicts to look beyond the Dwek debt and therefore, if Vastola's RICO conspiracy conviction stands on the government's collection of unlawful debt theory, it must stand on the basis of the Dwek debt.[21] Although the evidence is insufficient to support Vastola's conviction of the substantive RICO offense charged in

---

21. The government need prove only one predicate act to sustain a RICO conviction based on a collection of unlawful debt. *Cf. United States v.*

*Pepe,* 747 F.2d at 673 (sustaining RICO conviction based on attempted collection of a single unlawful debt).

Count 2, that does not preclude a finding that he conspired to commit the offense.

To prove a violation of section 1962(d), the government had to show that Vastola agreed to participate in the affairs of the enterprise through a collection of unlawful debt from Dwek. Mere assent to the commission of the predicate offense would be insufficient. 709 F.2d at 224. As explained in *Riccobene*, section 1962(d) criminalizes

> an agreement to 'conduct or participate ... in the conduct of [an] enterprise's activities' through the commission of predicate offenses ..., not an agreement to commit a pattern of racketeering activity alone.

709 F.2d at 224.

Thus, assuming proof of Vastola's agreement to the collection of the unlawful debt, that would only support his RICO conspiracy conviction if the collection offense was committed under the auspices of the enterprise. However, under *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985), Vastola did not have to agree to commit personally the predicate act to be guilty of a RICO conspiracy; it would be sufficient if he agreed to Saka's collection of the unlawful debt. *Id.*

Ironically, the most compelling evidence tying the Dwek loan to the enterprise is Vastola's own statement to Saka and Brocco that they were entitled to take "a piece" of Dwek's settlement because they "came *here* for backup." App. at 3386 (emphasis supplied). Although there is no evidence that the original extension of credit was funded by the enterprise, a jury reasonably could infer from Vastola's comment that the collection effort was one of the enterprise's unlawful endeavors. The fact that these remarks occurred in the context of

what appears to be general discussion about the status of various loans provides further support for an inference that the Dwek debt was tied to the enterprise.[22]

Although none of the statements attributed to Vastola indicates that he knew the details of the loan, a conspiracy conviction does not require proof that the defendant was aware of all aspects of the illegal activity. *See Riccobene*, 709 F.2d at 225. Furthermore, the government did not have to show that Vastola was a principal actor in the Dwek affair to prove his guilt on the RICO conspiracy charge. There is little question that Vastola knew the loan was unlawful and with that knowledge, encouraged Saka and Brocco to collect it. That is enough to establish Vastola's guilt on Count 3.

We conclude that a reasonable jury could find that collection of the debt from Dwek was an activity of the enterprise, rather than an independent venture on the part of Saka, and that Vastola conspired to further the enterprise through the collection. Accordingly, we affirm Vastola's conviction under section 1962(d) on the basis of the government's collection of unlawful debt theory.[23]

### D. SUFFICIENCY OF THE EVIDENCE OF MCA EXTORTION

■ The evidence is overwhelming that Vastola conspired to use extortionate means to collect LaMonte's debt arising from the MCA deal, as charged in Counts 4 and 9. Indeed, these were the only non-RICO charges of which Vastola was convicted. Pointing to numerous intercepted conversations in which he was berated by Levy for failing to secure payment of the debt, Vastola argues that he was aligned with LaMonte as a buyer in the transac-

---

**22.** Immediately preceding the discussion of the Dwek debt, the following exchange took place:

BROCCO: Listen let's take a couple of prices like this here, see I would love to have 50,000 of them.
VASTOLA: Rather take it ourselves. Take it ourselves. Forget about.
BROCCO: I told you, we have a situation like that you're always serious, you're always (UI).

VASTOLA: Well, we need the scratch, that's all.
Appendix at 3384.

**23.** In view of our decision with respect to the Dwek debt, we do not reach Vastola's challenge to the jury instructions on the pattern of racketeering requirement.

tion. Although the relationship between Levy and Vastola clearly was not harmonious throughout the deal, it was Vastola himself who repeatedly insisted to Levy that he was an equal partner with Levy and Pisello in the deal. He cannot complain now that the jury recognized him as such.

Further, Vastola's contention that he enjoyed friendly relations with LaMonte is belied by his repeated assertions to his co-conspirators that LaMonte's continued physical well-being hinged on his speedy repayment of the extension of credit. While Vastola argues on appeal that his comments stemmed from his understandable frustration at LaMonte's irresponsible behavior, it was hardly unreasonable for the jury to draw a different inference, especially in view of evidence that Vastola punched LaMonte in the nose. Finally, the agreement to use extortionate means to collect the debt can be readily inferred from Vastola's remarks at the September 23 meeting concerning the seizure of LaMonte's business.

In short, we have no difficulty concluding that Vastola's convictions under 18 U.S.C. §§ 894 and 1951, as charged in counts 4 and 9, are supported by substantial evidence, as the evidence shows that he was so involved in the MCA extortionate collection conspiracy.

### E. NAMING OF THE RICO ENTERPRISE

Count 1 of the superseding indictment, which described the RICO enterprise, repeatedly referred to it as the "Vastola Organization." Also, in the course of his closing statement, the prosecutor identified the enterprise as the Vastola Organization.[24] The government, however, adduced

no evidence that the RICO enterprise was denominated the "Vastola Organization" by its members or by any other persons.

Vastola's trial attorney objected to the government's use of the term, the "Vastola Organization," on at least two occasions, on February 8, 1989, following the charging conference and immediately following the court's charge to the jury. There is no indication that a contemporaneous objection was made to the closing summation. By letter memorandum to the district court following the charging conference, at which Vastola's attorney unsuccessfully moved to have the label be stricken from the indictment, the attorney wrote:

> We have asked that the Court strike from the indictment the highly prejudicial labeling of the alleged enterprise as 'the Vastola organization.' If, however, references to the 'Vastola organization' are not redacted from the indictment, we request that the jury be instructed ... that they must 'take special care in considering the RICO charges not to be influenced by the government's *charge* that the alleged organization is the so-called 'Vastola organization....'

App. at 2661 (emphasis in original).

This request was denied. Following the jury charge but before the jury retired, the attorney renewed his request which again was denied by the district court on the ground that the jury already had been instructed that charges in an indictment do not constitute evidence. Members of the jury were given copies of the superseding indictment for use during their deliberations.

On appeal, Vastola argues that the district court abused its discretion in refusing to either redact the indictment or give the

---

**24.** In his summation, the prosecutor stated that: Vastola Organization, you haven't heard that in this case. You've only heard it when the indictment is described. You can't point to a group of people walking down the street and say, hey, man, there goes the Vastola Organization. There is no place that you can call where you say can I speak to the Vastola Organization. Nor do any of the participants refer to themselves as members of the organization. This is an organization that doesn't

want to be known. It basically operates in secret.
Appendix at 2403.
The prosecutor also referred to the "Vastola Organization" in his opening statement. However, we will not set forth his comments herein because Vastola concedes that they were proper, as the prosecutor was entitled to attempt to prove the existence of an enterprise called the "Vastola Organization."

requested instruction and, as a result, he suffered manifest prejudice, particularly with regard to the RICO counts, which deprived him of a fair trial. The government in turn argues that the court had no power to redact the indictment and, in any event, the general instruction regarding the indictment's function as a charging instrument was sufficient to inform the jury that the label, the "Vastola Organization," was not evidence of Vastola's guilt. As explained below, we believe that Vastola has raised some very legitimate concerns. However, on the facts of this case, we find that there was no prejudice flowing from the denomination of the enterprise and therefore we shall not disturb Vastola's conviction on this ground.

▪▪▪ As a threshold matter, if Vastola has a claim of unfair prejudice, it must be based solely on the language of the superseding indictment because his trial counsel failed to object to the prosecutor's use of the term in his closing statement. Absent a contemporaneous objection, the district court's failure to mitigate the prejudicial impact of the prosecutor's remarks must be evaluated under the plain error rule. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *United States v. Sandini*, 888 F.2d at 308–09. Under the plain error rule, the prosecutor's allegedly improper references to the Vastola Organization would serve as a basis for reversal only if, considering the "totality of evidence against the accused," the error was serious enough to deprive Vastola of a fair trial. *Sandini*, 888 F.2d at 309.

Of course, the court has no reason to perform a plain error analysis unless the appellant has pointed to an error. In his references to the closing statement, Vastola has not claimed any error on the part of the district court. He does not claim that the court *sua sponte* should have delivered curative instructions or taken other measures to remove the taint of the prosecutor's allegedly prejudicial remarks. In fact, the remarks were not necessarily unfairly prejudicial as the prosecutor conceded the absence of any evidence that the enterprise was named the "Vastola Organization." Accordingly, as there is no claim of error with respect to the summation and no compelling evidence of prejudice, we will only consider whether the district court erred in refusing to redact the superseding indictment [25] or deliver the requested instructions.

We are aware of no RICO cases in which the government, as part of its trial strategy, named the enterprise after one of the defendants. Several cases cited by Vastola involve situations where the enterprise was controlled by an organized crime family and was labelled by the family's surname. *See, e.g., United States v. Salerno*, 868 F.2d 524, 528 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989); *United States v. Daly*, 842 F.2d 1380 (2d Cir.1988); *United States v. Scarfo*, 850 F.2d 1015 (3d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). Vastola argues that in each of these cases, the government introduced evidence establishing the existence of a crime family bearing the name included in the indictment. *See Scarfo*, 850 F.2d at 1018 (testimony demonstrated hierarchy of control within the Scarfo crime family). However, to establish an enterprise under section 1962(c), the government would have had to introduce the type of evidence discussed in these cases, regardless of the label it affixed to the enterprise. Consider-

---

**25.** Contrary to the government's suggestion, the district court had the power to strike references in the indictment to the "Vastola Organization." Numerous decisions have specifically recognized the power of the district court to redact from an indictment charges which the government has resolved not to prosecute. *United States v. Zauber*, 857 F.2d 137, 150–51 (3d Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), and superfluous language which unfairly prejudices the accused.

*United States v. Moya–Gomez*, 860 F.2d 706, 763 (7th Cir.1988). *See also United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (deletions from an indictment do not necessarily constitute unconstitutional amendments). In fact, the district court in its pretrial decision, struck the preamble to the original indictment on the ground that it contained "irrelevant and vague language which may imply guilt by association or insinuate unalleged facts." 670 F.Supp. at 1255.

ing that, as members of organized crime families, the defendants in these cases hardly were in a position to complain that the enterprise shared their name, the cases simply have no bearing on the specific question before us.

The situation here is more closely analogous to cases where defendants have sought to have aliases struck from indictments or to have reference to them precluded at trial. *See, e.g., United States v. Moya–Gomez*, 860 F.2d at 762–63; *United States v. Jorge–Salon*, 734 F.2d 789, 791 (11th Cir.), *cert. denied*, 469 U.S. 869, 105 S.Ct. 215, 83 L.Ed.2d 145 (1984); *United States v. Alfonso*, 552 F.2d 605, 618 (5th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977); *United States v. Persico*, 621 F.Supp. 842 (S.D.N.Y.1985). In those cases, the courts have held that the inclusion of an alias in an indictment, even one with strong negative connotations, is permissible if it is needed to connect the accused to the acts charged. *Persico*, 621 F.Supp. at 860–61. Still, as Vastola asserts, the government normally has been required to prove that the defendant was known by the alleged alias. *Id.*[26]

We recognize that in the RICO context, the government's naming of the enterprise after one of the defendants carries similar potential for prejudice as does identification of the defendant by a damaging alias. Of course, the risk of unfair prejudice is greatest where the defendant is only loosely affiliated with the enterprise. In such circumstances, the jury conceivably could infer an essential element of the RICO offense, namely, the defendant's participation in the enterprise, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), from unsupported language in the indictment characterizing the defendant as the enterprise's leader. In such cases, on a defen-

dant's motion, it might very well be appropriate for the district court to either redact the indictment or deliver a specific instruction cautioning the jury not to consider the enterprise's name as evidence of guilt. *See Moya–Gomez*, 860 F.2d at 763.

However, we do not perceive this to be such a case. While the co-conspirators did not specifically refer to the enterprise as the "Vastola Organization," the record clearly shows that Vastola was in charge. It is evident that the majority of illegal loans issued by the enterprise were subject to Vastola's approval, and that the co-conspirators understood Saka and Brocco to be Vastola's "people." In fact, Vastola himself, in a conversation with Saka and Levy about Brocco's failure to secure payment from LaMonte, stated that Brocco's behavior called into question the strength of his allegiances to the organization and to Vastola.

On this record, we cannot see how the naming of the enterprise possibly could have influenced the outcome of this case. Had the indictment read, 'Vastola's organization,' no reasonable claim of prejudice could be made, as the government did prove the existence of an organization headed by Vastola. We cannot imagine that use of the practically identical phrase, the "Vastola Organization," conveyed anything to the jury that was not already amply demonstrated by the evidence. Thus, while the district court's safest course of action may have been to issue a cautionary instruction, its refusal to do so was at most harmless error.

## F. ADMISSIBILITY OF TESTIMONY REGARDING LOANSHARKING TERMS

The government called Sergeant Robert Jones, a law enforcement officer who par-

**26.** *Persico* involved a RICO prosecution in which several defendants objected to the inclusion in the indictment of such aliases as "Frankie the Beast" and "The Snake." *Id.* at 860–61. The district court refused to redact the indictment before trial, reasoning that the aliases might be integral to the government's case, as the government had alleged that its primary evidence consisted of wiretap evidence in which

the defendants referred to each other by their aliases. *Id.* ("Even if prejudicial, ... aliases and nicknames are proper in an indictment where they will be part of the government's proof at trial.") The court stated, however, that, upon defendants' motion, it would consider redacting the indictment at the close of the government's case if the government failed to introduce proof of the aliases. *Id.*

ticipated in the electronic surveillance of Video Warehouse and other locations, to identify voices on the government tapes and explain other details of the investigation. During the course of his testimony, over defense counsel's objections, he interpreted three tape-recorded statements as references to loansharking. First, he testified that Saka's statement, "I have three for you," meant that Saka had "three loan shark payments." Second, he interpreted Vastola's comment, "Everybody I okay to Rudy for money is fuckin' up cause they think they got me as a buffer...." Jones explained that, given the context, "Okay meant that we okayed them to Rudolph Farone for a loanshark—." He was interrupted by an objection which was overruled. Finally, in reference to Brocco's and Vastola's remarks that they could "put it out for" two or three, Jones testified, "We could put it out for two. We could put it out for three. It's two points, two percent, terms used in loanshark loans."

The district court, relying on *United States v. Dicker*, 853 F.2d 1103 (3d Cir. 1988), and *United States v. De Peri*, 778 F.2d 963 (3d Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986), held that the above testimony was admissible under either Fed.R.Evid. 701[27] or 702.[28] The court opined that Jones was qualified as an expert "in the fields relevant to this case" and that his opinions on the meaning of phrases used in the wiretap evidence would be helpful to the jury.

On appeal, Vastola argues that the district court erred in its evidentiary ruling because Jones was neither qualified, offered or admitted an expert on loansharking under Fed.R.Evid. 702 and his testimony went beyond the scope of permissible lay opinion testimony under Rule 701. Vastola maintains that because "'loansharking' was the gravamen of all the

charges on which [he] was convicted," this improperly admitted testimony caused severe prejudice requiring reversal of his convictions on all counts. We disagree.

In *De Peri*, this court held that a police officer's explanation of cryptic remarks made in tape-recorded conversations between himself and the defendant were admissible under Rule 701 because it was rationally based on his perception of the conversation and helpful to the trier of fact. 778 F.2d at 977. The court noted:

Martin's language on the tapes is sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that are clear only to Martin and his audience. To the uninitiated listener, Martin speaks as if he were using code.

*Id.*

In *Dicker*, we explained that *De Peri* did not authorize the admission of all opinion testimony regarding the substance of recorded conversations. Such testimony is admissible only to assist in the jury's interpretation of coded portions of the conversation. 853 F.2d at 1109. Where the statements are clear, such opinion testimony is not helpful to the trier of fact and is inadmissible under both Rules 701 and 702. *Id.*

■ In this case, the loansharking terms explained by Jones fall squarely within the province of "coded" language beyond the comprehension of the average juror, and his opinion testimony was confined to portions of the tape containing those terms. Thus, the helpfulness requirement of both Rules 701 and 702 was met.

■ The proper provision for admission of Jones's testimony is Rule 702 because Jones lacked personal knowledge of the meaning which the parties to the wiretapped conversations attached to their re-

---

**27.** Rule 701 provides:

If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**28.** Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

marks. In both *De Peri* and *Dicker*, which were decided under Rule 701, the testifying witness was a party to the conversation. Where the witness's interpretation of the conversation is based solely on his "specialized knowledge," the testimony is admissible under Rule 702 if the witness is qualified as an expert. *See United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987) (DEA agent was qualified to interpret codes and jargon used by drug traffickers); *United States v. Nersesian*, 824 F.2d 1294, 1308 (2nd Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *United States v. Riccobene*, 709 F.2d at 230 (FBI agent qualified to define terms such as "La Cosa Nostra," "capi," and "consigliere" in organized crime context).

██ Given that Jones's opinion testimony was admissible for the limited purpose of defining the loansharking terms used by appellants, the sole remaining question is whether the district court abused its discretion in recognizing Jones as an expert. As stated in *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962), "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous."

Jones's qualifications were more than adequate to qualify him as an expert. He testified that he currently was a detective sergeant assigned to the Economic Crimes and Organized Crime Intelligence Unit of the Union County prosecutor's office. Over the course of his fourteen years of employment with that office, he had participated in wiretap investigations. He also had worked numerous undercover assignments in the investigation of "loansharking, credit card fraud, check fraud and gambling." In view of Jones's experience in the investigation of white collar crimes, including loansharking, it cannot be said that the district court abused its discretion in admitting him as an expert.[29]

██ Vastola's final complaint, that the prosecutor never formally moved to have Jones admitted as an expert, requires little discussion. Rule 702 does not condition the admissibility of expert testimony on the proponent's incantation of any particular phrases. While the usual trial practice of moving for the admission of expert testimony may place an adversary on notice that a witness's qualifications are in issue, in this case, the defense was fully aware that Jones would be testifying as an expert, as the prosecutor stated that in colloquy before Jones took the stand. Accordingly, we find that Jones's explanation of the loansharking terms was properly admitted under Rule 702.

## G. REFERENCE TO FEDERAL WITNESS PROTECTION PROGRAM

The government did not call John La-Monte, the victim of the MCA extortion, but instead relied primarily on wiretap evidence. To buttress his argument that he was aligned with LaMonte as a buyer in the MCA deal, Vastola, in his defense, played a tape which purportedly showed that his business dealings with LaMonte were consensual. Over objection, the prosecutor recalled Agent Mahoney in rebuttal to testify about LaMonte's active cooperation with the government. Before Mahoney took the stand, Vastola's attorney objected in colloquy that such testimony would be improper rebuttal because it was unresponsive to any issues raised by the defense. In response, the prosecutor ar-

---

**29.** *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987), cited by Vastola in support of his argument that insufficient foundation was laid for Jones's testimony, is distinguishable. In *Aloe,* the court held that a sales representative for a tractor company was not qualified to give expert testimony in a negligence action as to the cause of a tractor shovel's malfunction. *Id.* Although the witness had extensive experience in determining the costs of repairing and replacing damaged equipment, he had no experience or training which would confer expertise as to how the equipment worked.

Here, Jones's undercover work in loanshark investigations and extensive experience in police wiretapping efforts undoubtedly provided him with knowledge of loanshark jargon beyond that of the average layperson.

gued that the rebuttal was needed to negate the defense's suggestion that the relationship between Vastola and LaMonte was consensual. The district court allowed the rebuttal on the understanding that it would be narrowly confined to the questions of when LaMonte's period of active cooperation with the government began and ended.

Mahoney testified that LaMonte began to actively cooperate with the government shortly after May 18, 1985. He further testified that LaMonte's period of active cooperation ended in late September of 1985 when "he and his family were placed in FBI protective custody, custody-not custody, but protection and the whole family was removed from the area." This was the last testimony the jury heard.

Defense counsel promptly moved for a mistrial on the ground that Mahoney's reference to the protective custody gave rise to an improper and prejudicial inference that LaMonte had not testified because he was afraid of the defendants. After the district court denied the motion, defense counsel renewed it and requested in the alternative that the court give a missing witness instruction to alleviate the prejudicial impact of Mahoney's testimony. The renewed motion was denied. However, the following day, the court struck the final portion of Mahoney's testimony and instructed the jury to disregard it.

On appeal, Vastola argues that the district court's cautionary instruction was insufficient to remove the taint of Mahoney's testimony, and that the district court abused its discretion when it refused to give the requested instruction or grant a mistrial. We reject both of these contentions.

■ The district court's refusal to give a missing witness instruction clearly did not constitute reversible error. In *United States v. Busic*, 587 F.2d 577, 586 (3d Cir. 1978), *rev'd on other grounds*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), this court held that a missing witness instruction is not appropriate when the witness is available to both the defense and

the prosecution. The court reasoned that the government's failure to call a particular witness does not warrant an inference that the witness's testimony would have been adverse; at most, it signifies that the testimony would have been unhelpful to the government's case. *Id. See United States v. Nahoom*, 791 F.2d 841, 846 (11th Cir. 1986). Here, although LaMonte was in the federal witness protection program, there is no indication that he was unavailable to the defense. In fact, Vastola's attorney commented in colloquy that he declined to call LaMonte because his testimony would have focused on collateral matters. In these circumstances, a jury instruction that LaMonte's testimony would have favored the defense would be no more justified than an instruction that his testimony would have favored the government.

Vastola's contention that he was entitled to a mistrial requires us to examine the nature and severity of the prejudice he alleges. As a general proposition, we recognize the potential for unfair prejudice flowing from a witness's testimony about his or her involvement in the federal witness protection program. As stated in *United States v. Ciampaglia*, 628 F.2d 632, 640 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), "a witness's participation in a witness protection program 'is a matter that must be handled delicately'" as the jury might improperly consider evidence of such participation as proof of the defendant's alleged dangerous propensities. *Id.* at 640 (citation omitted). *See also United States v. Nahoom*, 791 F.2d at 845–46; *United States v. Frankenberry*, 696 F.2d 239, 242 (3d Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1392 (1983). Arguably, references to a nontestifying victim's participation in the program carry greater potential for prejudice because the jury might falsely infer that the victim's absence was due to fear.

However, not all references to the federal witness protection program are prejudicial to the defense.[30] In *Frankenberry*,

---

**30.** In fact, in some cases, defense attorneys have
sought to use such evidence to impeach the

we held that the government may elicit the fact of a witness's involvement in the program so long as it "does not exploit any inference of threat from the defendant." 696 F.2d at 242. We further opined that in assessing the prejudicial impact of the testimony, a court should consider whether it specifically inculpates the defendant as the source of threats to the witness. *Id.* at 243. If it does, then, on defense counsel's motion, the district court may be obligated to give a cautionary instruction or, in extraordinary cases, declare a mistrial. *See United States v. Carney*, 461 F.2d 465, 468 (3d Cir.1972). However, the potential for prejudice is slight where the testimony only vaguely suggests that the witness was placed in the program because of threats emanating from the defendant. *Frankenberry*, 696 F.2d at 243. *Accord United States v. Panas*, 738 F.2d 278, 285 (8th Cir.1984).

 Bearing in mind these principles, we are unconvinced that Mahoney's testimony severely prejudiced the defense. Even assuming that the jury improperly inferred that LaMonte's absence was due to fear, given the large number of individuals involved in the RICO enterprise, it would be speculative to presume that any such inference was attributed to appellants' conduct. We further note that the prosecution made no further reference to the Witness Protection Program-it did not "exploit" Mahoney's testimony. Finally, given the overwhelming evidence of appellants' guilt as to the MCA extortion, we would be hard pressed to find that Mahoney's testimony, in itself, irreparably destroyed the defense.

Accordingly, we conclude that the district court did not abuse its discretion when it refused to declare a mistrial. *See United States v. Wright–Barker*, 784 F.2d 161, 175 (3d Cir.1986). The district court's cautionary instruction was more than adequate to mitigate any unfair prejudice caused by Mahoney's testimony and, in keeping with *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107

S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987), we will assume that the jury followed it.

## H. APPOINTMENT OF NEW COUNSEL

Saka challenges his conviction on the ground that the district court abused its discretion in denying his pretrial motion for assignment of new counsel. By letter dated October 10, 1988, Saka requested assignment of new counsel because his court-appointed attorney had "developed a series of physical, mental, emotional and domestic problems" as a result of a marital conflict. The district court held a hearing on October 12, 1988, to determine whether the attorney was competent to represent Saka at trial, which was scheduled to begin within a week but did not actually start until November 28, 1988.

At the hearing, Saka stated that he had known about his attorney's "domestic problems" for approximately two months. Although Saka was satisfied with the attorney's representation of him at various hearings over that period, he felt that he had not adequately conferred with the attorney about trial strategy and believed that the attorney was "not fully able to handle" his case. In response to inquiries by the district court, the attorney acknowledged that he had experienced severe depression when his wife left him on September 8, 1988, and had become apprehensive about his ability to proceed with the case. However, he recently had started taking antidepressant medication and, after an initial adverse reaction which was eliminated by an adjustment of the dosage level, he stated that he felt fine and believed he was competent to represent Saka. The district court denied Saka's motion, stating that the relevant question was his attorney's competence at the time of the hearing. As there was no indication that the attorney currently was experiencing a debilitating emotional disorder, the district court was satisfied he could effectively represent Saka.

---

credibility of government witnesses. *See United States v. Pandozzi*, 878 F.2d 1526, 1530 (1st Cir.1989); *United States v. Tarantino*, 846 F.2d

1384, 1407 (D.C.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988).

■ The question before us is whether the district court's denial of the pretrial motion for appointment of new counsel constituted an abuse of discretion and if so, whether the denial caused Saka manifest prejudice requiring reversal of his conviction.[31] Under *United States v. Welty*, 674 F.2d 185, 190 (3d Cir.1982), a district court, faced with a request for substitution of counsel, has a duty to "inquir[e] as to the reason for the defendant's dissatisfaction with his existing attorney" and should grant the request if "good cause" is shown. *Id.* at 187–88. *See also McMahon v. Fulcomer*, 821 F.2d 934, 942 (3d Cir.1987).

■ Based on the record as it appeared at the time of the hearing, the district court acted well within its discretion in denying Saka's motion.[32] As the district court observed, the relevant question was whether at the time of the hearing, it appeared likely that the attorney could serve as a reasonably effective advocate at trial. Although Saka may have lost confidence in his attorney when he learned about the attorney's bout with depression, that alone would not constitute "good cause" for substitution of counsel, as Saka had no absolute right to counsel of his choice, *Davis v. Stamler*, 650 F.2d 477, 479–80 (3d Cir. 1981), or to a special rapport with his attorney. *Morris v. Slappy*, 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983). To prevail on his motion, Saka had to show that his attorney currently was experiencing problems so severe as to call into doubt his ability to render competent assistance at trial.

In view of Saka's own testimony that he had no specific objection to the attorney's representation of him at pretrial hearings and the attorney's assurances that he was prepared for trial and had overcome his previous emotional difficulties, there was no reason for the district court to have granted the motion. Certainly, it cannot be said that every attorney who has experienced an emotional crisis while preparing for a trial automatically must be disqualified from proceeding with the representation. If the attorney is competent and adequately prepared at the time of trial, it is within the discretionary power of the district court to refuse to substitute new counsel.

Given our finding that there was no abuse of discretion, we need not consider whether Saka suffered prejudice as a result of the district court's decision. However, even assuming an abuse of discretion, we still would have no basis for reversing Saka's conviction because he has not claimed that he was prejudiced by the ruling. As recently observed in *Sandini*, 888 F.2d at 305, our inquiry into the propriety of a discretionary pretrial ruling involves "two separate determinations," whether the district court exceeded its discretion and whether the defendant thereby was prejudiced. As Saka has pointed to nothing in the record which suggests that his fears at the time of the hearing materialized, we would have no choice but to reject his claim even if he had demonstrated good cause for the appointment of new counsel.

## I. THE ELECTRONIC SURVEILLANCE

### 1. *Background*

The government's evidence at trial consisted largely of tapes made from electron-

---

**31.** Relying on a litany of cases in which this court has expressed its preference for reviewing allegations of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. § 2255 rather than on direct appeal, the government argues that Saka's claim is not ripe for review. *See United States v. Sandini*, 888 F.2d at 312; *Government of Virgin Islands v. Forte*, 806 F.2d 73, 77–78 (3d Cir.1986); *United States v. Gambino*, 788 F.2d 938, 950 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986). Saka, however, does not claim ineffective assistance of counsel but instead challenges a pretrial ruling that he was not entitled to substitution of counsel. While this claim implicates Sixth Amendment considerations insofar as we must consider whether Saka suffered any prejudice as a result of the district court's decision, Saka has not invoked directly his right to effective assistance of counsel. Accordingly, we conclude that the claim is reviewable on direct appeal. We further note that Saka remains free to raise a constitutional challenge his attorney's performance in a subsequent proceeding under section 2255.

**32.** In fact, the district court is to be commended for the sensitivity it displayed in evaluating Saka's claim.

ic surveillances of conversations between the co-conspirators from late 1984 to October 1985 pursuant to state and federal court orders, as well as of tapes of consensually recorded conversations from May 1985 to September 1985 between the co-conspirators and John Lamonte, the victim of the MCA extortionate collection conspiracy.

■ State and federal authorities engaged in surveillance activities in at least four jurisdictions-New Jersey, Maryland, and the Southern and Northern Districts of New York-and, at the conclusion of the surveillances, all of the tapes were sealed in accordance with the Wiretap Act.[33] 18 U.S.C. § 2518(8)(a). The sealing orders pertaining to the federal tapes provided that the FBI was to maintain custody of the tapes and that the contents of the tapes were to be disclosed only pursuant to court order, except as provided by 18 U.S.C. § 2517.

On October 6, 1987, Judge Breitkopf of the New Jersey Superior Court entered orders permitting the unsealing by a federal district court judge of approximately seven state wires, covering over a hundred reels of tape, "for use in the preparation and during the several trials of" the defendants named in the original indictment. All of the orders specified that the tapes were to be "maintained in a secure place within the Offices of the United States Attorney for the District of New Jersey." The government has conceded a "technical departure" from Judge Brietkopf's unsealing order in that the tapes were not physically unsealed before a federal judge.

On October 15, 1987, the district court ordered the unsealing of numerous federal tapes which resulted from surveillances in New Jersey for use in the pretrial preparation and trials in United States v. Vastola. The order was issued pursuant to a supporting affidavit filed by an Assistant United States Attorney which stated that unsealing was necessary "so that electronically enhanced copies of portions of the recordings [could] be prepared for use as trial exhibits." Unlike Judge Brietkopf, the district court did not specify where custody of the tapes was to be maintained.

On August 5, 1988, Judge Howey of the United States District Court for the District of Maryland ordered the unsealing of the "Maryland" tapes, specifying that custody was to be maintained by special FBI agents in Newark, New Jersey. He also stated that "[t]he Special Agents in whose custody such tape recordings are released may permit technicians working with the United States Attorney's Office for the District of New Jersey to make copies of them." A similar order was entered by Judge Scully of the United States District Court for the Southern District of New York on April 6, 1988.

After the unsealing orders were executed, the government sent all of the original tapes to Paul Ginsberg, a private individual it had employed to enhance and authenticate the tapes. It is undisputed that Ginsberg had unsupervised possession of the tapes for approximately 35 days while he was enhancing them, and that he was not deputized by any court to perform that function.

**33.** In 1987, when the district court granted appellants' motion for severance, it also denied a motion, joined in by all defendants named in the original indictment, to suppress evidence from the electronic surveillance. *United States v. Vastola*, 670 F.Supp. 1244, 1276 (D.N.J.1987). In that ruling, the court expressly found, with few exceptions, that the government had adequately shown probable cause for the surveillances and that the surveillance orders themselves were valid. *Id.* Appellants also moved to suppress evidence from the wiretapping of Video Warehouse, the situs of the criminal enterprise, on the ground that the wiretapping ended on March 25, 1985, but the tapes were not

sealed until July 15, 1985. *Id.* at 1282. The court found that the integrity of the tapes had not been compromised and therefore suppression was not justified. *Id.* (citing *United States v. Falcone*, 505 F.2d 478, 484 (3d Cir.1974)).

On appeal, Saka argues that the tapes should have been suppressed due to the government's delay in sealing them but has not challenged the district court's finding that the tapes had not been altered. As the district court's decision was fully consistent with *Falcone*, we will not further discuss the implications of the sealing delay. Saka has not appealed the district court's ruling that the initial interception order was supported by probable cause.

Ginsberg testified as an expert about the procedures he had used in enhancing the tapes. He explained that

[e]nhancement is a misnomer. We don't enhance anything per se. But rather we'll take a signal from a tape recorder on which there is a conversation recorded, feed it through certain equipment which is designed to null out or minimize offending signals or other noise which is beyond the limits of the human voice spectrum, and the results is what we call the enhanced copy.

Appendix at 485.

He asserted that in the filtration process, there is no risk of alteration in the content of the enhanced copy, and that the original tapes are in no way modified. Ginsberg placed the originals in a locked storage container when he was not using them. At the government's request, Ginsberg also examined the tapes for signs of tampering before and after he enhanced them and concluded that the integrity of the tapes had not been compromised.

### 2. Admissibility of Evidence from Electronic Surveillance

Saka argues that the district court erred in admitting the tapes from the electronic surveillance because the government violated the various court unsealing orders in contravention of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 [hereinafter Wiretap Act].[34] Specifically, he maintains that the government, in sending the tapes to Ginsberg for enhancement, exceeded the scope of the unsealing orders, which never contemplated that a private individual would have unsupervised custody of the tapes for a prolonged period of time, or that the government would do anything more than copy the tapes for trial.

Saka relies on section 2518(8)(a) of the Wiretap Act, which provides in pertinent part that:

The contents of any wire, oral or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device..... Immediately upon the expiration of the period of the [wiretap] order, or extensions thereof, *such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders....* The presence of the seal ... or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. § 2518(8)(a) (emphasis supplied). Section 2517(3), in turn, provides for the use of such tapes as evidence in federal and state criminal proceedings.

According to Saka, section 2518(8)(a) evinces legislative intent that courts will closely supervise all phases of the government's handling of evidence derived from electronic surveillances. He analogizes this case to situations where other courts have held that, in certain circumstances, it might be necessary to suppress evidence due to lengthy delays in the sealing of the tapes. *See, e.g., United States v. Ojeda Rios,* 875 F.2d 17 (2d Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 231, 107 L.Ed.2d 183 (1989); *United States v. Mora,* 821 F.2d 860 (1st Cir.1987).

As the government points out, however, section 2518(8)(a) on its face deals with *sealing* requirements, rather than with the use or treatment of tapes after their unsealing. The government relies-as did the district court-on section 2517(2). Under that section:

[a]ny investigative or law enforcement officer who, by any means authorized by

---

**34.** He also suggests that the New Jersey state tapes were never unsealed. Presumably, he is referring to the government's failure to comply with Judge Brietkopf's order, which required the participation of a federal district court judge in the unsealing process. This technical infraction of the unsealing order does not, however, warrant a conclusion that the tapes were never unsealed. Although the government did not strictly comply with the terms of Judge Brietkopf's orders, that does not negate the fact that the unsealing orders were entered and executed.

this chapter, has obtained knowledge of the contents of any wire, oral or electronic communication or evidence derived therefrom may use such *contents to the extent such use is appropriate to the proper performance of his official duties.*

18 U.S.C. § 2517(2) (emphasis supplied).

According to the government, its enhancement of the tapes falls squarely within section 2517(2) because it was part of the United States Attorney's trial preparation and thus was incident to the performance of an "official duty."

Neither party is entirely correct, although the government's ultimate conclusion that the tapes were admissible is unassailable. Reading subdivision (2) of section 2517 in light of its legislative history and the section as a whole, it seems clear that, in that subdivision, Congress was concerned with the substantive use of information contained in tapes rather than with the physical treatment of the tapes themselves. Section 2517(1) limits the disclosure of the tapes' contents to an "investigative or law enforcement officer" to situations where the disclosure "is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." 18 U.S.C. § 2517(1). Other subdivisions of section 2517 address the use of such evidence in criminal proceedings, section 2517(3), the privileged character of the evidence, section 2517(4), and preconditions for the use of evidence of crimes not enumerated in the original interception application, section 2517(5).

■■■ Furthermore, the legislative history to section 2517(2) indicates that, by "use ... appropriate to the proper performance of ... official duties," Congress "envi-

sion[ed] use of the contents of intercepted communications ... to establish probable cause for arrest ... [or] search" or other substantive uses. S.Rep. No. 1097, 90th Cong., 2d Sess. 107, *reprinted in* 1968 U.S. Code Cong. & Admin.News, at 2112, 2188. In view of its legislative history, it is difficult to see how this provision could apply to a government use alleged to compromise the physical integrity of the tapes.

■■■ In fact, no section of the Act expressly defines the government's responsibility in handling tapes subsequent to the execution of an unsealing order; such cases fall within a statutory gap. *See United States v. Angiulo*, 847 F.2d 956, 977 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988). However, we cannot infer from this legislative oversight that Congress was indifferent to the government's treatment of tapes after their unsealing, as an overriding legislative concern quite clearly was to prevent the admission of wiretap evidence which has been subject to tampering. Therefore, while the literal language of section 2518(8)(a) would indicate that the section is limited to the sealing requirement, we will consider the propriety of the enhancement under that section, as we agree with Saka that it is the primary vehicle through which Congress sought to ensure the physical integrity of wiretap evidence.[35] *Accord Angiulo,* 847 F.2d at 977 ("the standards applicable in delay-of-sealing cases ... are relevant to the unsealing problem").

The government contends that suppression is available under section 2518(8)(a) only where there is no seal affixed to the tapes "or a satisfactory explanation for the absence thereof."[36] As the tapes were

---

**35.** The legislative history to section 2518(8)(a) indicates that it was intended to establish procedures "to safeguard the identity, physical integrity, and contents of the recordings to assure their admissibility into evidence." 1968 U.S. Code & Admin.News at 2193. Furthermore, the legislative history to section 2517 states that it "must ... be read in light of section 2518." *Id.* at 2188. Therefore, even if we applied section 2517 and concluded that the enhancement was incident to the performance of official duties, we still would be bound to consider whether

admission of the tapes was consistent with section 2518.

**36.** The government also argues that, insofar as Saka challenges an unauthorized disclosure of the contents of the wire intercepts to Ginsberg, he is limited to the civil remedy set forth in section 2520. That assertion clearly is correct. *See United States v. Iannelli,* 477 F.2d 999, 1001 (3d Cir.1973), *aff'd on other grounds,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) ("the suppression remedy specified in 18 U.S.C.

unsealed by court order, the government maintains that it had a satisfactory explanation for the absence of a seal and therefore, suppression was unwarranted. This argument, although consistent with the literal language of section 2518(8)(a), is unresponsive to the specific problem raised by Saka, which concerns the government's responsibilities in handling the tapes after their unsealing. As pointed out in *United States v. Mora,* 821 F.2d at 864–65, which involved a sealing delay, a literal construction of section 2518(8)(a) could lead to outlandish results, as it would permit the admission of tapes which remained unsealed for months as long as the government had them sealed on the eve of trial. 821 F.2d at 865 ("An untimely seal contravenes the spirit of the statute just as much as a missing seal."). By the same token, it strains credibility to suggest that Congress authorized the admission of all wiretap evidence which is unsealed, without regard for how the tapes were treated after their unsealing.

The primary purpose of section 2518(8)(a), however, is to ensure the physical integrity of the tapes. *Mora,* 821 F.2d at 867; *United States v. Diadone,* 558 F.2d 775, 780 (5th Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Angelini,* 565 F.2d 469, 471 (7th Cir.1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978); *United States v. Falcone,* 505 F.2d

478, 484 (3d Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). In *Falcone,* a "sealing delay" case, we held that:

> where the trial court has found that the integrity of the tapes is pure, a delay in sealing the tapes is not, in and of itself, sufficient reason to suppress the evidence obtained therefrom.

505 F.2d at 484.

This holding was consistent with *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974), where, in reference to an unlawful interception, the Supreme Court stated that "Congress intended to require suppression where there is a failure to satisfy those statutory requirements that *directly and substantially* implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." Thus, not every technical infraction of the statute mandates suppression. Rather, the defendant must point to a statutory violation which creates a serious risk that the legislative purpose will be thwarted. *See United States v. Chavez,* 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974) ("suppression is not mandated for every violation of Title III.") [37]

▮ Here, Ginsberg gave compelling testimony that the integrity of the tapes was not compromised in the enhancement

---

§ 2518(10) applies to unlawful interceptions. A civil remedy applies to unauthorized disclosures. 18 U.S.C. § 2520."). *See also Resha v. United States,* 767 F.2d 285, 288 (6th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986); *United States v. Vento,* 533 F.2d 838, 855 (3d Cir.1976). Therefore, in a civil proceeding under section 2520, Saka is free to argue that a private individual never should have been privy to the contents of the tapes because they were privileged. 18 U.S.C. § 2517(4). We will not resolve that question in a direct appeal from a criminal conviction.

As we understand Saka's argument, however, the gravamen of his complaint is that the government failed to comply with court orders intended to ensure the physical integrity of the tapes and, if its conduct is approved by this court, the statutory safeguards of Title III will be undermined. Accordingly, we are treating this as a "physical integrity" case.

**37.** *Giordano* and *Chavez* both were decided under section 2518(10)(a), which provides for the suppression of "unlawfully intercepted" communications, evidence obtained pursuant to an "insufficient" authorization order, and evidence obtained through interceptions "not made in conformity" with the order. Neither the Supreme Court nor this court has had occasion to decide whether section 2518(8)(a) furnishes a basis for suppression independent of section 2518(10)(a). If the suppression remedy is confined to section 2518(10)(a), then the government could with impunity engage in the wholesale editing of all tapes lawfully intercepted, because section 2518(10)(a) on its face deals only with interceptions. Given our conclusion that the tapes were lawfully admitted, we need not resolve this question today. However, we do point out that it is highly unlikely that Congress intended to allow a criminal conviction to rest on wiretap evidence which had been subject to tampering.

process. We realize that some appellate courts have indicated that wiretap evidence may be suppressed without proof of tampering on the theory that alterations of the recordings often are difficult to detect. *See United States v. Massino*, 784 F.2d 153, 156 (2d Cir.1986); *United States v. Johnson*, 696 F.2d 115, 124 (D.C.Cir.1982) (interpreting D.C.Code). *Cf. United States v. Ojeda Rios*, 875 F.2d at 23 (lengthy delay in sealing of tapes requires suppression unless government proffers a "satisfactory explanation" for the delay). However, even if we were inclined to follow these cases, this would not be an appropriate time for doing so, as Ginsberg's uncontroverted testimony was that tampering can be detected by competent experts in the field of electronic enhancement and, in any event, Saka does not seriously contend that the tapes were subject to tampering. Therefore, we have no basis for concluding that the type of harm the statute was meant to prevent occurred here.

Accordingly, we hold that the tapes were admissible notwithstanding the government's technical infraction of the custody requirements of the unsealing orders, as there is no showing that the government's relinquishment of control over the tapes caused a "direct[ ] and substantial[ ]" violation of section 2518(8)(a).

## IV. CONCLUSION

 We have considered appellants' remaining contentions and find them to be without merit.[38] In view of our decision herein, the judgment of conviction and sentence of Vastola under Count 2 will be reversed and he will be acquitted on that count and the judgment of acquittal for Vastola under Count 1 will be reversed and his conviction will be reinstated on that count. Except to the foregoing extent regarding Vastola, appellants' convictions will be affirmed. The case will be remanded to the district court for further proceedings consistent with this opinion. Vastola shall be sentenced on count 1 and shall be resentenced on all the other counts on which he was convicted except for Count 2. *See United States v. Sebetich*, 776 F.2d 412, 415 & n. 2 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988).

**38.** Vastola asserts that the district court abused its discretion when it permitted two law enforcement officers to testify, over objection, that they were assigned to organized crime units. According to Vastola, this background evidence was inadmissible under Fed.R.Evid. 403 because its probative value was outweighed by its prejudicial effect, as it gave rise to an improper inference that appellants had organized crime connections. Our scope of review of this question is limited. *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). In this case, we do not believe that the district court exceeded its discretion, as evidence regarding the officers' unit assignments served the legitimate purpose of apprising the jury of their qualifications for investigating appellants' activities. *Cf. United States v. Daly*, 842 F.2d 1380, 1388–89 (2d Cir.1988) (background evidence as to structure of organized crime families was properly admitted under Rule 403 balancing test).

Saka contends that three warrants to search his automobile, residence and business for evidence of copyright violations failed to satisfy the Fourth Amendment particularity requirements. As a result, he argues that "[a]ll of the video recordings, blank tapes and video equipment should have been suppressed." He does not, however, point to any evidence introduced at trial which was seized pursuant to the allegedly defective warrants. Because Saka was not prosecuted for copyright violations, and has not demonstrated that any unlawfully seized evidence was used against him at trial, we need not reach the Fourth Amendment issues he raises. Assuming, *arguendo*, that the warrants were constitutionally deficient and that evidence obtained pursuant to them was improperly admitted, a reversal on this ground still would be inappropriate because the government's most damaging evidence against Saka derived from its electronic surveillance of Video Warehouse and other locations. Accordingly, at best, he has pointed to a constitutional error which was harmless beyond a reasonable doubt. *See Chapman v. State of California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Clemons*, 843 F.2d 741, 753 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).